### 12924. ROBINSON & REYNOLDS *v.* ATLANTIC COAST LINE RAILROAD COMPANY.

1. " Whenever any inspector or assistant inspector of the Bureau of Animal Industry shall issue a certificate showing that such officer had inspected any cattle which were about to be shipped and had found them free from . . any . . infectious, contagious, or communicable disease, such animals so inspected and certified may be shipped into and through any State . . without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture.

2. The expenses of the second dipping, and the losses on the cattle, incident thereto, should have been allowed to the plaintiffs, after determination by the jury; and the direction of the verdict against such allowance was error.

DECIDED APRIL 13, 1922. REHEARING DENIED MAY 23, 1922.

Action for damages; from Seminole superior court — Judge Worrill. September 3, 1921.

*W. L. Bryan,* for plaintiffs.

*Rich & Rawls, Pope & Bennet,* for defendant.

HILL, J.  Robinson & Reynolds, at Donalsonville, in Seminole county (formerly Decatur county), Georgia, delivered to the Atlantic Coast Line Railroad Company forty head of cattle for transportation to Montgomery, Alabama, and they were there delivered at the stock-yards to Tatum, Embry & Company.  Robinson & Reynolds were not authorities on tick eradication or quarantine regulations which were in force in the said county at the time of this shipment, the same being carried on co-operatively by county, State, and Federal authorities.  At Donalsonville the Federal government had an officer, a veterinarian, in charge of such work, in whom, under the Federal act, was duly vested all the administrative and quasi-judicial duties incident to the enforcement of the statute on quarantine and tick eradication, and the enforcement of the rules and regulations passed by the Department of Agriculture under and by virtue of the authority vested in it by the statute. The plaintiffs presented the said cattle to this officer, who, after due inspection of the same, issued therefor what is known as a "free certificate," which was attached to the waybill, and the material portions of which were as follows:  "This certifies that 40 cattle, originating in the county of Decatur, have been inspected by me and found free from any symptoms of scabies (mange), Texas fever, and have been dipped once in arsenical solution on May 1st, 1920, and may be shipped for slaughter. (Signed) A. P. Abbott, Inspector."  This certificate is a part of the brief of the evidence in the case.  The cattle, after having been duly inspected, were delivered to the Atlantic Coast Line Railroad Company, as above stated, for the purpose of delivery to the consignees at their stock-pens in Montgomery, Alabama.  Decatur county (or Seminole county), from which these cattle were shipped, was a quarantined area, under the regulations, as stated above, of the government and its official in charge.  The cattle, after having been delivered to the defendant company, and, according to the evidence, without exposure to infection, were transported to Montgomery, and were there held for seven days by the company, and the company, without consulting the official in charge of the quarantine regulations at Montgomery, instead of delivering the cattle, upon their arrival at Montgomery, into the free or non-quarantined pens to which

they had been consigned by the plaintiffs, had the cattle dipped for tick eradication in Montgomery, under the view of the law, apparently entertained by the railroad company, that the first dipping of the cattle, which had taken place at Donalsonville, when they were shipped, was not sufficient, and that the law required a second or final dipping. The plaintiffs claimed that during the seven days, while the cattle were being held, by the railroad company for the second dipping the market value of cattle generally went down, and they sought to recover the alleged amount of the consequent loss, and also the amount of certain items of expense for feeding and dipping the cattle a second time, claiming that the second dipping was not necessary, and that the expenses connected therewith were illegally incurred, and that the plaintiffs were damaged in the sum of $523.12.

There is no dispute in the record or the brief of the evidence as to the correctness of the items of expense incurred in feeding and dipping the cattle at Montgomery, provided the railroad company was authorized to hold the cattle for the seven days without delivery and have them dipped a second time. In other words, the holding of these cattle for the second dipping, if required by law and the regulations of the Bureau of Animal Industry, would give the plaintiffs no claim against the railroad company for this work. The controlling question in the case is whether the holding of the cattle by the railroad company at Montgomery, Alabama, and giving to them a second dipping before the delivery of them into the non-quarantined pens at Montgomery, to which they were duly consigned, was proper under the law and the regulations of the Bureau of Animal Industry. The learned judge who tried the case entertained the view that the second dipping was necessary and proper and was in accordance with the regulations of the department, and, on motion of counsel for the defendant, at the conclusion of the evidence he directed a verdict in favor of the plaintiffs for $20.50, which was the value of one of the cows killed in the pens at Montgomery, and for costs. The plaintiffs filed a motion for a new trial, claiming that the damages amounted to $523.12, and insisting that the second dipping was wholly unwarranted by law and the regulations of the department, and that the expense connected therewith was an unjust imposition upon the plaintiffs as the

owners of the cattle.  This motion was denied, and the judgment is here for review.

The learned counsel for both the plaintiff in error and the defendant in error argued the case at great length.  After giving the questions involved a very careful consideration, this court is of the opinion that the trial judge erred in directing the verdict as rendered.  We think, under the law and regulations of the department, that the railroad company at Montgomery was not authorized to make the second dipping of the cattle, and (without following the learned counsel fully into the arguments which they have submitted) we are of the opinion that the case is controlled by certain regulations of the Department of Animal Industry on the subject of tick eradication.

1.  We think that the certificate issued by the inspector at the point of shipment, at Donalsonville, showed a sufficient dipping of the cattle and rendered unnecessary the second dipping.  In 32 Statutes at Large of the United States, p. 791, among other provisions are the following: " Whenever any inspector or assistant inspector of the Bureau of Animal Industry shall issue a certificate showing that such officer had inspected any cattle or other live stock which were about to be shipped, driven, or transported from such locality to another, as above stated, and had found them free from Texas, or splenetic, fever infection, pleuro-pneumonia, foot-and-mouth disease, or any other infectious, contagious, or communicable disease, such animals so inspected and certified may be shipped, driven, or transported from such place into and through any State or Territory, including the Indian Territory, and into and through the District of Columbia, or they may be exported from the United States without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture; and all such animals shall at all times be under the control and supervision of the Bureau of Animal Industry of the Agricultural Department for the purpose of such inspection. "  It is admitted in this case that the inspector at Donalsonville, after making an inspection of the cattle in question, made the certificate set out above and that the cattle were shipped thereunder to Montgomery.  This section plainly asserts that after cattle are shipped from a tick-eradication area and are certified as *free* by the agent of the bureau, any future

inspection shall be by and under the control of the Department of Agriculture. It provides that where animals have been inspected by the inspector or the assistant inspector of the Bureau of Animal Industry and his certificate given that they are free from disease, they may be shipped from one State to another without any other or further inspection; and this provision was intended to permit. the transportation of animals so inspected from one State to another without being subject to any other inspection pursuant to State laws. Of course, the Bureau of Animal Industry could require a second inspection and a second dipping at the destination, if proper.

When the cattle reached Montgomery, instead of being placed in non-infectious pens, to which they had been assigned, they were held up by the railroad for seven days, and then, by the railroad authorities, dipped a second time; and this was done without any inspection by the government inspector who was in charge of the stock-yards or quarantine regulations at Montgomery. There was no evidence offered by the railroad company that the cattle were infected when they reached Montgomery. No charge was ever made to that effect. This being so, the act of the railroad authorities at Montgomery in subjecting the cattle to a second dipping was unnecessary, and the expense therein incurred was an unjust charge against the owners of the cattle. While we are of the opinion that, under the laws and regulations of the Department of Animal Industry, in view of the certificate of the inspector at Donalsonville, the second dipping was unnecessary, and while we think that the statute quoted above is controlling on the question, and that it would be clearly contrary to the whole scheme of government regulation for any dipping or tick eradication to be carried on except under the direction of the government, and that the action of the railroad authorities at Montgomery, in undertaking the second dipping without consulting the government, was without authority, we are impressed with the fact that the railroad authorities at Montgomery acted in perfect good faith and under the impression that the second dipping was authorized and was necessary under the law.

2. There is another controlling question in this case. It will be noted, from the certificate of the inspector issued at Donalsonville, that the cattle in this case were shipped for " immediate

slaughter;" and while this is not stressed by the plaintiffs in error, it would seem that the second dipping was rendered wholly unnecessary by the fact that the shipment of cattle was for immediate slaughter. Paragraph 3 of section 2 of Bureau of Animal Industry Order No. 263, covering the interstate movement of live stock, is as follows: "Cattle of herds of the quarantined area, which are not diseased with scabies, may be shipped, transported or otherwise moved interstate for immediate slaughter upon inspection by a bureau inspector and when accompanied by a certificate from such inspector." The evidence is undisputed that these forty head of cattle were shipped upon inspection by the bureau at Donalsonville, who issued the certificate that said cattle were free from scabies. Certainly the fact that the cattle were to be immediately slaughtered upon reaching Montgomery would seem to render the second dipping wholly unnecessary, unless the cattle had been exposed on the way to Montgomery; and the evidence is clear that such was not the case. The evidence is further clear that when the cattle reached Montgomery they were entirely free from scabies and in good condition. Without considering this matter further, this court is of the opinion that the law cited above is controlling, and that the second dipping by the railroad authorities at Montgomery was unwarranted, and that the owners of the cattle, the plaintiffs in error, are entitled to recover from the railroad authorities such expenses as were incidental to the unwarranted dipping, arising from the act itself and from feeding and keeping the cattle during the seven days before they were dipped at Montgomery, and the incidental losses on the cattle. For these reasons we think that the judgment of the trial court was erroneous, and that the plaintiffs should be allowed to prove to the jury such charges, incidental to the said act of the railroad company at Montgomery, to which they were subjected.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*

### ON MOTION FOR REHEARING.

HILL, J. The opinion of the court in this case is based upon the explicit terms of the act of 1903 in connection with the rules and regulations of the Department of Agriculture, promulgated in pursuance of the terms of said act. 32 Stat. 791. The rules

and regulations in pursuance of the act, expressly cited and relied upon in the opinion, are found in the publication of the " Regulations governing the interstate movement of live stock," issued by the United States Department of Agriculture, on page 17, paragraph 3. The act of Congress of 1903 referred to, and which is relied upon by the plaintiff in error, is not ambiguous in its terms, but explicitly declares that, " Whenever any inspector or assistant inspector of the Bureau of Animal Industry shall issue a certificate showing that such officer had inspected any cattle or other live stock which were about to be shipped, driven, or transported from such locality to another, as above stated, and had found them free from Texas, or splenetic, fever infection, pleuro-pneumonia, foot-and-mouth disease, or any other infectious, contagious, or communicable disease, such animals so inspected and certified may be shipped, driven, or transported from such place into and through any State or Territory, including the Indian Territory, and into and through the District of Columbia, or they may be exported from the United States without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture; and all such animals shall at all times be under the control and supervision of the Bureau of Animal Industry of the Agricultural Department for the purposes of such inspection, " and the second section of this act provides that the " Secretary of Agriculture shall have authority to make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals from a foreign country into the United States or from one State or territory of the United States or the District of Columbia to another." .

To carry out the provisions of this act the Secretary of Agriculture, on July 1, 1919, published certain rules and regulations. Among these rules and regulations are the following which are applicable to the interstate movement of cattle for purposes other than immediate slaughter: Section 3, paragraph 1, of regulation 2, applies to cattle of the quarantined area, or other cattle *exposed to or infested with ticks,* and it permits the movement of such cattle which have been properly dipped twice with an interval of from 7 to 12 days in a permitted arsenical solution or otherwise treated in a manner approved by the Secretary of Agriculture, under

the supervision of a bureau inspector, and which have been certified by the said inspector to be free of infection from splenetic fever and permits the movement interstate for any purpose. And paragraph 2 of this section of the regulations expressly provides that cattle in areas where tick eradication is being systematically conducted in co-operation with the State authorities, or any cattle presented at a properly equipped dipping station which on inspection by a bureau inspector are found to be apparently free from ticks, may, after one dipping in an approved arsenical solution under the supervision of a bureau inspector and certification by the said inspector, be shipped interstate for any purpose: provided, that the conditions are such that the cattle may be moved to the free area or to a transportation line without exposure to infection. The difference between the two regulations is apparent. Paragraph 1 provides that the cattle of the quarantined area, or other cattle exposed to or infested with ticks, must be dipped twice with an interval of from 7 to 12 days in a permitted arsenical solution or otherwise treated in a manner approved by the Secretary of Agriculture under the supervision of a bureau inspector, and which have been certified by the said inspector to be free of infection from splenetic fever, and then the cattle may be moved interstate for any purpose. Paragraph 2 of the section provides that where there has been one dipping in an approved arsenical solution under the supervision of a bureau inspector and certification by the said inspector they may be shipped interstate for any purpose. These regulations are in strict compliance with the act of 1903, and the fact that the cattle in question had been dipped by a bureau inspector and were found to be apparently free from ticks made it unnecessary, in the opinion of this court, by the express terms of the act and the regulations in pursuance thereof, to subject the cattle to a second dipping, unless authorized by the Department of Agriculture for some cause either of exposure to infection or to actual infection after the shipment and after the first dipping and the certification showing freedom from splenetic fever.

Paragraph 1 of section 3 of regulation 3, found on page 17 of the pamphlet issued by the Secretary of Agriculture, is as follows: " Cattle affected with scabies may be shipped interstate for purpose other than slaughter if dipped twice in a permitted dip, 10 to 14 days apart, under the supervision of a bureau inspector, and so

certified by such inspector, or such cattle may be so shipped if dipped once in a permitted dip under bureau supervision at the point of origin, provided arrangements have been made for the second dipping, under bureau supervision." Paragraph 2 of this section is as follows: "Cattle of the quarantined or free area not visibly diseased with scabies, but which are known to be part of a diseased herd or to have come in contact with diseased cattle or infectious cars or premises, may be shipped interstate for purposes other than slaughter, if dipped once at the point of origin, under the supervision of a bureau inspector, in a permitted dip, or the cattle may be dipped on route by special permission first had and obtained from the chief of the bureau." And paragraph 3 of this section is as follows: "Cattle of herds of the quarantined area, which are not diseased with scabies, may be shipped or transported interstate for any purpose upon inspection by a bureau inspector and when accompanied by a certificate from such inspector showing the cattle to be free from disease or exposure thereto." In the present case the evidence shows the forty head of cattle to have been shipped from a quarantined area; that they were not diseased with scabies; that this fact was determined upon inspection by a bureau inspector; and that this bureau inspector's certificate accompanied the shipment of cattle showing the cattle to be free from disease or exposure thereto.

These regulations in pursuance of the act of 1903 make it perfectly clear that the provisions of the Act of Congress were not intended to prohibit interstate transportation of what is known as "free cattle" or cattle which had been inspected and dipped by a bureau inspector before shipment and pronounced free from infection. The act of 1903 expressly provides that animals inspected by the Bureau of Animal Industry and certified to be free from disease might be shipped from one State to another without further inspection, and the court explicitly holds, under the terms of said act, that it did not prohibit the shipment of animals free from disease, and that the Secretary of Agriculture had power thereunder to make rules and regulations in reference to such animals, the violation of which alone would not constitute a crime. "The act of Congress, then, being limited to cases where the animal was affected with an infectious or communicable disease, it was not within the power or authority of the Secretary of Agriculture

to extend the act, and by an order or regulation bring within its penal provisions matters which were not criminal by the terms of the act. United States *v.* Hoover, 133 Fed. 951.

Learned counsel for the movant insists, in his motion for a rehearing, that the act of 1903 had been repealed by the act of 1905, and that the provisions of the act of 1903 could not be applied to the shipment involved in this case, and thus evince the fact that this court " has not grasped what was the issue in the case at bar, and hence has failed to decide that issue, while the issue was clearly understood by the trial judge, and was actually decided by him, and thus the opinion does a grave injustice to the trial judge, as well as an injustice to the defendants in error." This court may have been so unfortunate as to fail to grasp the issue involved in the case. Our excuse is that we decided the issue involved under the explicit terms of the act of 1903, which, according to our limited apprehension, controlled the only question of fact and law in the case, to wit, whether there should have been a second dipping of the cattle in question, which had been inspected and dipped and certified as free from disease by an inspector of the Bureau of Animal Industry when delivered for shipment. This court is unable to agree with the statement of the learned counsel that the act of 1905 repealed the act of 1903, upon the construction of which the opinion was made. It is conceded that there is no express repeal of the terms of this law or of the regulations made in pursuance thereof. A very close examination of the terms of the act of 1905 and of the rules and regulations which apparently were made in pursuance thereof fails to disclose any conflict that would tend to establish a repeal by implication. The Secretary of Agriculture, in the compilation of the laws and the rules and regulations of the department, seems not to have discovered any conflict between the act of 1903 and the act of 1905. In the publication of the pamphlet showing the laws and the rules and regulations made in pursuance thereof, both the act of 1903 and the act of 1905 are given, and not a hint or intimation made of any conflict between any of their terms or provisions. On the contrary, a close examination of the two acts discloses the fact that as to tick eradication the rules and regulations published by the Secretary of Agriculture, as made by the department in 1919, are based entirely upon the act of 1903. It

is hardly possible that the Secretary of Agriculture would have published both laws if there had been conflicts between the terms of the two, without calling some attention to it. Among the regulations for the transportation of cattle, in paragraph 3 of section 3 of regulation 3, occurs the following clear and unmistakable statement: " Cattle of herds of the quarantined area, which are not diseased with scabies, may be shipped or transported interstate for any purpose upon inspection by a bureau inspector and when accompanied by a certificate from such inspector showing the cattle to be free from disease or exposure thereto." These rules are expressly based upon the act of 1903, and if the act of 1903 had been repealed or modified by the act of 1905, it would hardly have appeared as a part of the law regulating interstate movement of live stock, issued by the United States Department of Agriculture in 1919. It would seem, therefore, that where the terms of the act itself are explicit and the rules and regulations made in pursuance thereof are without ambiguity, and the facts, as shown by the record in this case, that the cattle were shipped from a quarantined area and were not diseased with an infectious disease or with scabies, and were inspected by a bureau inspector, and were accompanied by a certificate from such inspector showing that the cattle were free from disease or exposure thereto, as in the present case, there could remain little doubt that the second dipping of the cattle was not authorized even by the Federal bureau through its proper inspector. We can discover nowhere in the act or in the regulations any proposition justifying the dipping of cattle except when authorized by the United States Agricultural Department. But even if the rules and regulations made by the Department of Agriculture under the terms of the act of 1905 were in conflict with the express terms of the act of 1903, the act itself would prevail over such rules and regulations, for it was not within the power of the Secretary of Agriculture to extend the act of 1905 and by an order or regulation bring within its penal provisions matters which were not criminal under the terms of the acts of 1905 and 1903. In other words, there could be no conflict between the terms of the acts, whether the acts of 1905 or 1903, and the regulations made in pursuance of the acts, for in such an event the provisions of the act would control.

The second authority on which the opinion of this court was

based was the fact that the cattle in question were shipped under a bill of lading calling for the *" immediate slaughter"* of the cattle. The learned counsel for the movant insists that the court must have overlooked the fact that the record nowhere shows that this shipment of cattle was for immediate slaughter, and that the opinion to that effect, contained in the second division, makes a " distinct mistake" in saying that these cattle were shipped for immediate slaughter, whereas the certificate of the inspector shows that the word " immediate" was distinctly left out before the word " slaughter". The certificate of the bureau inspector appears to have been attached to the bill of lading on which these cattle moved, and this bill of lading, which is a part of the record, expressly declares " 40 head of cattle for *immediate* slaughter, consigned to Embry, Tatum & Co., Montgomery, Ala., care of Union Stock Yards, Certificate No. A21044." There may have been a mistake as to this matter. The mistake was not made by the member of this court who wrote the opinion in this case. Paragraph 2 of section 2 of regulation 3 of the rules and regulations of the Department of Agriculture provides that " Cattle of the free area not visibly diseased with scabies, but which may be a part of a diseased herd, may be shipped or transported interstate for immediate slaughter to any recognized slaughtering center where separate pens are provided for yarding exposed cattle, " provided certain conditions mentioned are observed and complied with; and paragraph 3 of this section provides that " Cattle of herds of the quarantined area, which are not diseased with scabies, may be shipped, or otherwise moved interstate for immediate slaughter, upon inspection by a bureau inspector and when accompanied by a certificate from such inspector. "

This court is therefore of the opinion that the motion for a rehearing is without merit; that no rule of law or regulation of the Department of Agriculture or fact in evidence was overlooked; and that the decision of the court is in strict conformity to the provisions of the act of 1903 and the rules made in pursuance thereof. The motion is denied.

*Rehearing denied. Jenkins, P. J., and Stephens, J., concur.*