THE STATE OF KANSAS, *ex rel. J. E. Torrance, as County Attorney, etc.,* v. THE MISSOURI PACIFIC RAILWAY COMPANY.

No. 14,185.   (81 Pac. 212.)

SYLLABUS BY THE COURT.

1. INFECTED CATTLE—*Importation—Prescribed Rules Exclusive.* Cattle driven into Kansas for immediate slaughter from any point south of its south line, and carrying Southern ticks, are deemed by statute to be infected with, and capable of communicating, Texas, splenic or Spanish fever, and such animals cannot be so transported into the state in the absence of rules regulating their admission, to be prescribed by the live-stock sanitary commission.

2. RAILROADS—*Nuisance—Injunction by State.* A railway company that maintains a lane or passageway for the driving of infected cattle from the Indian Territory into this state, under circumstances mentioned in the first paragraph of this syllabus, may be enjoined in a suit brought by the state to abate a public nuisance.

3. ——— *Statute Construed.* Sections 7451 and 7452 of the General Statutes of 1901 construed and applied.

Error from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed June 10, 1905. Reversed.

*C. C. Coleman,* attorney-general, and *J. E. Torrance* and *S. C. Bloss,* associate counsel, for The State.

*G. H. Buckman, J. H. Richards,* and *C. E. Benton,* for defendant in error.

The opinion of the court was delivered by

WILLIAM R. SMITH, J.: This was a suit brought by the state of Kansas, on the relation of the county attorney of Cowley county, to enjoin the Missouri Pacific Railway Company from maintaining a nuisance in violation of the live-stock sanitary laws of the state. The petition was filed July 7, 1904.

For several years the railway company has main-

tained a cattle shipping-station named Davidson on its line of road in Cowley county, situated about two miles north of the Indian Territory line. From its stock-yards at that place the company laid out and maintained a lane, bounded on either side by a wire fence, extending two miles south to the Kansas state line, and opening into a pasture in the Indian Territory. This passageway was maintained for the purpose of allowing prospective shippers to drive herds of cattle from south of the quarantine line into Kansas for shipment. Testimony was introduced at the trial tending to show that herds of Southern cattle were driven up the lane, including cows to coax the calves along; that the cows were permitted to wander back to the Indian country after the calves had been loaded on cars for shipment; that splenic fever is caused by ticks which fall from Southern cattle and either fasten themselves on native animals or hatch out small ticks that do; that Southern cattle driven up this lane had communicated fever to native cattle the year before the suit was tried. None of the cattle driven into this state was ever inspected, nor any bill of health issued in respect to them. It was shown that 450 head of Southern cattle were shipped from Davidson in June, 1904, over the line of defendant in error, consigned to the National stock-yards at East St. Louis, Ill.

The gravamen of the complaint against the railway company appears in the following extract from the petition:

"Defendant, if permitted to continue the introduction of said cattle into Kansas from the infected districts aforesaid, in the manner aforesaid, is liable, by reason of the escape of the said cattle through the fences of said lane, and by coming in contact with the native cattle along and adjacent to said lane, to infect the native cattle of that immediate vicinity with Texas fever, and spread and scatter the same throughout the county, to the great damage and detriment of the citizens of this county, by reason of which said railway

company, in the manner and form aforesaid, has been maintaining, and is now maintaining, and threatened, and is about to continue, a public nuisance within the county of Cowley and state of Kansas."

A trial before the court resulted in a judgment favorable to defendant. The state has prosecuted proceedings in error. The following sections of the statute have application to the question involved:

"All cattle being at or brought from any point south of the south line of the state of Kansas, and carrying *Boophilus bovis,* or Southern ticks, are deemed to be infected with and capable of communicating Texas, splenic or Spanish fever, and such cattle shall not be shipped or transported into the state of Kansas except for immediate slaughter, and then only under such rules and regulations as may be prescribed by the live-stock sanitary commission.

"It shall be unlawful for any person or persons to bring, drive or transport any cattle into any county of the state of Kansas, except for immediate slaughter, as provided in the preceding section, from any point south of the south line of Kansas, without having first caused such animal or animals to be inspected and passed under certificate of health by the live-stock sanitary commission of this state or some inspector thereof; and any person or persons violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than fifty nor more than one thousand dollars, or by imprisonment in the county jail not less than thirty days nor more than one year, or by both such fine and imprisonment." (Gen. Stat. 1901, §§ 7451, 7452.)

Acting under the provisions of section 7434 of the General Statutes of 1901 the live-stock sanitary commission determined that quarantine regulations were necessary to prevent infectious diseases among domestic animals, and notified the governor of the fact. The latter, on June 2, 1904, issued a proclamation that cattle brought from points south of the thirty-seventh parallel of north latitude, or west of the west line of Kansas, were infected with, and capable of

communicating, splenic or Spanish fever, or a disease known as itch or mange, to Kansas herds when imported into the state, and establishing a quarantine against all such cattle, and that "all cattle hereafter brought, shipped or transported through the state of Kansas shall be admitted only under such rules and regulations as are, or shall hereafter be, provided and adopted by the live-stock sanitary commission of this state." Rule No. 8 of the live-stock sanitary commission reads:

"Any persons desiring to avail themselves of the passage of cattle for slaughter purposes from points south of the south line of Kansas, without inspection and the payment of fees, may do so by consigning them to the quarantine pens of whatever market they may be destined, but under no condition shall they be unloaded in native chutes or native pens of Kansas unless they are accompanied by a certificate of health issued by a Kansas inspector. Also cattle destined for points beyond the limits of Kansas may unload for feed and rest without state inspection or payment of fees at any shipping-yards on line of road on which they are being shipped, provided each and every shipment is accompanied by a certificate of health issued by an agent of the bureau of animal industry; otherwise shall be accompanied by a certificate issued by a Kansas inspector."

Another rule of the commission provides that each car carrying cattle from the infected area into or through the state must have a placard attached thereto stating in bold letters that "this car contains Southern cattle," and the way-bill stubs shall have marked plainly on the face thereof the words "Southern cattle."

It will be observed that section 7451 of the statutes, *supra,* declares cattle brought from south of the south line of Kansas and carrying Southern ticks are deemed to be infected with and capable of communicating Texas, splenic or Spanish fever, and such cattle shall not be shipped or transported into the state, except for immediate slaughter, "and then only under such rules

and regulations as may be prescribed by the live-stock sanitary commission."

The next section of the statutes prohibits the driving or transporting of any cattle into any county of the state, except for immediate slaughter, "as provided in the preceding section," from any point south of the south line of Kansas, without an inspection and the obtaining of a certificate of health from the sanitary commission or some inspector thereof.

Reading together the two sections of the statute last referred to, it seems clear that cattle transported into the state for immediate slaughter cannot be brought here for such purpose unless permitted by the rules and regulations of the live-stock sanitary commission. Rule No. 8, *supra,* has reference to transporting by railroad. This is apparent from the regulation in the rule respecting the unloading of animals, which by no possibility could have application to cattle on foot. It is conceded that there is no rule of the commission respecting the driving of cattle into or through the state. It is the contention of the railway company that, it being lawful to drive cattle into the state for the excepted purpose—namely, for immediate slaughter—by failing to act in the matter of making rules the live-stock commission cannot make that act a crime which the statute authorizes. A careful reading of the law, however, will disclose that cattle brought into Kansas can only come here under such rules and regulations as the commission may prescribe, even for the excepted purpose. This is the clear meaning of section 7451, and section 7452 makes it unlawful to drive cattle into Kansas "except for immediate slaughter," with the added phrase "as provided in the preceding section."

There being an absolute inhibition in the law against the driving of cattle into the state from infected districts unless the live-stock sanitary commission shall promulgate rules and regulations as to their inspection, a failure of the commission to act in that respect,

and to make rules and regulations, must be regarded as a determination by it to exclude all cattle attempted to be driven into the state from such districts. If, as contended by counsel for the railway company, any and all cattle may be driven into the state for immediate slaughter from points south of the state line, without inspection, an infected herd may be driven lawfully from the north line of the Indian Territory to Topeka or Kansas City, Kan., for slaughter, threatening with deadly inoculation all the native cattle contiguous to the roads over which they might pass. Such is not the spirit, letter or intention of the law. If Southern cattle can be driven lawfully two miles into the state, the driving of them a distance of 100 or 200 miles would be equally permissible.

The objection that the acts of defendant below in maintaining the cattle-trail did not constitute a public nuisance is ill-founded. To place in jeopardy the animal industry of a state where stock-raising is one of the principal sources of wealth is a matter of concern to all. A menace of such nature should be met with prompt preventive measures by those charged with the duty of enforcing the laws.

The judgment of the court below is reversed, with directions to proceed further in accordance with this opinion.

All the Justices concurring.