## MINTZ et al. v. BALDWIN.*

District Court, N. D. New York.
Feb. 15, 1933.

*Judgment affirmed 53 S. Ct. 611, 77 L. Ed. ——.

702

Robert E. Whalen (of Whalen, McNamee, Creble & Nichols), of Albany, N. Y. (R. M. Orchard, Asst. Atty. Gen. of Wisconsin, of counsel), for plaintiffs.

John J. Bennett, Jr., Atty. Gen. of New York, and Henry S. Manley, Solicitor for Department of Agriculture and Markets, of Albany, N. Y. (W. P. Brown, Deputy Atty. Gen., of counsel), for defendant.

Before AUGUSTUS N. HAND, Circuit Judge, and COOPER and BRYANT, District Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above).

The plaintiffs insist that the order of the New York Commissioner of Agriculture and Markets is invalid because it involves a regulation of shipments in interstate commerce in a field which Congress has already occupied. The legislation which they regard as occupying the field comprises the act of February 2, 1903 (21 U. S. Code, §§ 120, 121 and 122 [21 USCA §§ 120–122]) and the Act of March 3, 1905 (21 U. S. Code §§ 123, 124, 125 and 126 [21 USCA §§ 123–126]).

Section 1 of the act of 1903 (21 USCA § 120) authorizes and directs the Secretary of

Agriculture to establish such rules and regulations as he may deem necessary concerning the exportation and transportation of live stock "from any place within the United States, where he may have reason to believe" "dangerous, contagious, infectious, and communicable diseases in cattle and other livestock" exist. The same section of the act (21 USCA § 121) further provides that whenever an inspector of the Bureau of Animal Industry shall issue a certificate showing that he has inspected any cattle about to be shipped and has found them free from communicable disease they may be shipped "from such place into and through any State * * * without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture. * * *"

█ Section 1 of the act of March 3, 1905 (21 USCA § 123), authorizes and directs the Secretary of Agriculture to quarantine any state or portion thereof "when he shall determine the fact that cattle or other livestock" therein "are affected with any contagious, infectious, or communicable disease. * * *" The succeeding sections (21 USCA § 124 et seq.) provide that the Secretary shall make regulations for the inspection and shipment of cattle from the quarantined areas and that cattle may only be transported from such areas under conditions prescribed by the Secretary.

The act of 1905 can hardly have any bearing on the present situation. It is a quarantine act and the sections are so entitled. Speaking of this act, it was said by Judge Grubb that: "Congress legislated, having in view the probable occurrence of epidemics of varying seriousness and intensity." United States v. Louisville & N. R. Co. (D. C.) 176 F. 942, 947. It in terms only relates to cases where an area is quarantined after the Secretary of Agriculture has determined that cattle therein are affected with a contagious disease. Such determination is a condition precedent to the operation by the establishment of a quarantine. Whipp v. United States (C. C. A.) 47 F.(2d) 496. There was no such determination here, nor has any basis for such a determination been shown in the states from which the cattle were shipped.

Both the act of 1903 and the act of 1905 were before the Supreme Court in Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101. There a statute of the state of Kansas made it a misdemeanor for any person to transport cattle into the state from the south without having them in-

spected and passed as healthy by the proper state officials or by the Bureau of Animal Industry of the United States. Asbell was convicted under the state statute. Justice Moody, who wrote the opinion, said that: "The only Federal question * * * is whether the statute was a restriction of interstate commerce which was not within the power of a state to impose." It was held that the state might "enact laws for the inspection of animals coming from other states with the purpose of excluding those which are diseased and admitting those which are healthy" and the conviction was sustained. Justice Moody referred to the two acts of Congress we have mentioned and remarked that the only provision relevant to the issues before the court was the one of the act of 1903 that where a federal inspector had issued a certificate of freedom from communicable disease, cattle might be transported in interstate commerce without further inspection and that since the Kansas statute recognized this there was no conflict between the act of Congress and the state statute. A departmental regulation brought to the attention of the court was held to have no bearing because it related only to transportation from quarantined states, and no quarantine was there involved. In this decision we have a clear ruling that the states may pass inspection laws affecting the importation of cattle, at least where the Department of Agriculture has not acted in the matter.

But it is said that Asbell v. Kansas, supra, is in effect overruled by Oregon-Washington R. & N. Co. v. Washington, 270 U. S. 87, 46 S. Ct. 279, 70 L. Ed. 482, and such was the holding of a three judge court in Must Hatch Incubator Co. v. Patterson (D. C.) 27 F.(2d) 447. The Oregon-Washington Case involved a federal quarantine act against farm produce likely to convey injurious insects from infested localities. The decision in Asbell v. Kansas, supra, was not discussed. A majority of the court held that the federal act was so broadly drawn as to show an intention of Congress to occupy the field and to inhibit state quarantine legislation. The provisions of the federal plant quarantine act are not unlike those of the cattle quarantine act of 1905, and, if a state quarantine statute were involved here, we might feel that the decision in the Oregon-Washington Case was controlling. The Missouri Court of Appeals has held that state laws providing for interstate quarantine of cattle were superseded by the act of 1905. State v. Chicago, M. & St. P. R. R., 200 Mo. App. 109, 206 S. W. 419 (1918). But the

contrary has generally been held. Ex parte Goddard, 44 Nev. 128, 190 P. 916; Pecos & N. T. R. Co. v. Hall (Tex. Com. App.) 222 S. W. 170; St. Louis, I. M. & S. R. Co. v. Campbell, 116 Ark. 119, 172 S. W. 823; State v. Mo. Pac. R. Co., 71 Kan. 613, 81 P. 212. The Supreme Court of Colorado apparently does not regard the Oregon-Washington Case as controlling where state quarantine acts for cattle are involved. People v. Morgan, 79 Colo. 504, 246 P. 1024, 1026.

But we are not called upon to determine the validity of such state quarantine laws. Quarantine legislation relates normally to infestations in the nature of epidemics in specific areas and differs radically in governmental scope and practical operation from day to day inspection of cattle transported in interstate commerce under ordinary conditions. It is noticeable that in Asbell v. Kansas, supra, the federal quarantine act of 1905 was treated as totally irrelevant to the question of the power of the state of Kansas to enforce its inspection laws, which were held not to conflict with the inspection provisions of the act of 1903.

State inspection laws to prevent importation of diseased cattle have a long background of administrative and legislative approval and the intent "to override existing state authority to deal with local exigencies is not to be imputed to the Congress unless its enactment compels that conclusion. * * *" Atchison, T. & S. F. R. Co. v. Railroad Comm., 283 U. S. 380, 51 S. Ct. 553, 556, 75 L. Ed. 1128; Savage v. Jones, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182; Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 18 S. Ct. 488, 42 L. Ed. 878. The act of 1903 manifests no such intent. It is not an act of general operation. The Secretary of Agriculture is only empowered by the act of 1903 to apply regulations to areas where he has "reason to believe" contagious disease exists. It is only when cattle are about to be transported out of such areas that inspectors of the Bureau of Animal Industry are authorized to issue certificates. United States v. Johnson (D. C.) 35 F. (2d) 256. Moreover, the language of section 1 affirmatively implies that the continued operation of state inspection laws is contemplated, for it provides that cattle certified as free from disease by federal inspectors may be transported in interstate commerce "without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture; and all such animals shall at all times be under the control and supervision of the Bureau of Animal Industry * * * for the purposes of such inspection." Since such animals continue to be subject to federal inspection, the "further inspection" to which they are not thereafter subject must, it would seem, be state inspection. Why should state inspection laws be nullified where federal certificates have been issued unless their continued vigor in the absence of such certificates is contemplated? Why should cattle which are shipped out of areas where the Secretary of Agriculture has "reason to believe" disease exists be expressly subjected to federal supervision unless it was intended that cattle transported under other circumstances from other areas should continue to be subject to state inspection laws? This aspect of the act of 1903 has not passed unnoticed heretofore. See United States v. Hoover (D. C.) 133 F. 950, 952; Robinson & Reynolds v. Atlantic Coast Line R. Co., 28 Ga. App. 484, 112 S. E. 389, 391.

The Secretary of Agriculture has failed and indeed declined to establish a system of interstate inspection. Meanwhile the states have built up departments to do this work and to guard the live stock within their borders against infection from imported diseased cattle. No attempt has been made by the federal government to check administration by the states, which has now become general. On the contrary, such inspection has been welcomed by the Department of Agriculture and relied on as a safeguard to interstate commerce. In such circumstances it is against all reason to suppose that the states lack the power to protect themselves against manifest and serious dangers in the only available way. The decision in Asbell v. Kansas is a clear sanction of state inspection laws.

We conclude from the scope and language of the statute that, fairly interpreted, it is not in conflict with the order promulgated by the defendant, and that, therefore, the intent to supersede the state's exercise of its police power is not to be implied. Carey v. South Dakota, 250 U. S. 118, 39 S. Ct. 403, 63 L. Ed. 886. Congress has circumscribed its regulation and occupied a limited field. Atchison, T. & S. F. R. Co. v. Railroad Comm. of California, 283 U. S. 380, 391, 392, 51 S. Ct. 553, 75 L. Ed. 1128.

The contention that the defendant's order directly burdens interstate commerce is without merit. The validity of reasonable state inspection laws has always been recognized. Reid v. Colorado, 187 U. S. 137, 23

S. Ct. 92, 47 L. Ed. 108; Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101. The order involves no categorical prohibition of all importation of cattle such as was involved in Hannibal & St. J. Railroad Company v. Husen, 95 U. S. 465, 24 L. Ed. 527. Plaintiffs have not shown that the defendant's order in any way discriminates against cattlemen outside New York. Cattle are only excluded which are diseased or have been exposed to disease and cattle may lawfully be excluded that have been so exposed. Smith v. St. Louis & Southwestern R. Co., 181 U. S. 248, 21 S. Ct. 603, 45 L. Ed. 847. Cattle within New York are subject to regulation and quarantine. Section 76 of the New York Agriculture and Markets Law. People v. Teuscher, 248 N. Y. 454, 162 N. E. 484. The New York regulation applies to citizens of New York importing cattle as well as to those of other states. Reid v. Colorado, 187 U. S. at page 152, 23 S. Ct. 92, 47 L. Ed. 108. There is not the slightest indication in the Supreme Court decisions that a state must have the same regulations for inspection of diseased cattle within its borders as it requires for those entering it. Rasmussen v. Idaho, 181 U. S. 198, 21 S. Ct. 594, 45 L. Ed. 820; Smith v. St. Louis & Southwestern R. Co., 181 U. S. 248, 21 S. Ct. 603, 45 L. Ed. 847; Reid v. Colorado, 187 U. S. 151, 23 S. Ct. 92, 47 L. Ed. 108.

It may be argued that the commissioner's order is invalid because it would subject to inspection cattle that have been certified as free from disease by inspectors of the United States Bureau of Animal Industry. The order does not expressly refer to cattle thus certified but it is drawn in general terms and contains no exception in their favor. If applied to such cattle, it would doubtless be unconstitutional. Robinson & Reynolds v. Atlantic Coast Line R. Co., 28 Ga. App. 484, 112 S. E. 389. But it should not be construed as applying to them, for it must be read in subordination to section 74 (3) (4) of the New York Agriculture and Markets Law which provides for admission of any cattle accompanied by certificates issued by the United States Bureau of Animal Industry. Even if the order be construed as excluding cattle with certificates from this Bureau it would not be wholly void. It is well settled that a statute may be constitutional as applied to one set of facts and unconstitutional as applied to another. Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 289, 42 S. Ct. 106, 66 L. Ed. 239; Kansas City Southern R. Co. v. Anderson, 233 U. S. 325, 34 S.

Ct. 599, 58 L. Ed. 983. And this is so, not only when the unconstitutional operation of the statute is the result of a distinct and grammatically separable provision, but also when it is the result of general prohibitory language contained in a single clause, provided the intent of the Legislature will not be violated by allowing the statute to operate in a limited field. W. J. Sloane v. Commonwealth, 253 Mass. 529, 149 N. E. 407; Joel v. Bennett, 276 Ill. 537, 115 N. E. 5; State v. Sheldon, 29 Wyo. 233, 213 P. 92. As Justice Brewer remarked in McCullough v. Virginia, 172 U. S. at page 112, 19 S. Ct. 134, 138, 43 L. Ed. 382: "However broad and general its [the statute's] language, it cannot be interpreted as extending beyond those matters which it was within the constitutional power of the legislature to reach."

Whether a state statute which is unconstitutional as applied to one situation is capable of a construction that will give it a restricted and constitutional operation as to other situations is a matter upon which the state courts may speak authoritatively. Smiley v. Kansas, 196 U. S. 447, 25 S. Ct. 289, 49 L. Ed. 546. The New York courts would evidently give effect to the Commissioner's order if limited in its scope to cattle upon which it may constitutionally operate. Robert Dollar Co. v. Canadian Car & Foundry Co., 220 N. Y. at page 278, 115 N. E. 711. To enforce the order within constitutional limits will in no way violate the intent with which it was promulgated. Though it could not constitutionally operate upon cattle certified by federal inspectors, the plaintiff has presented no certificates from them and, therefore, has not brought himself within the class of persons on whom it could not constitutionally operate. He cannot be heard to complain that the order is unconstitutional as applied to others. Smiley v. Kansas, 196 U. S. 447, at page 457, 25 S. Ct. 289, 49 L. Ed. 546; Robert Dollar Co. v. Canadian Car & Foundry Co., 220 N. Y. 270, 115 N. E. 711.

The motion for a preliminary injunction should be denied and the bill of complaint dismissed for the reason that the order of the Commissioner of Agriculture and Markets appears to have been validly issued pursuant to sections 72 and 74 of the Agriculture and Markets Law of the state of New York under a valid exercise of the police power of that state. The temporary restraining order granted to the plaintiff should likewise be vacated.

BRYANT, District Judge, concurs.

706

COOPER, District Judge (dissenting).

Statement.

The plaintiffs are copartners, doing business under the name of Mintz & Mintz in the states of Wisconsin, New Jersey, and other states, and are engaged in the breeding and sale and transportation in interstate commerce of cattle for dairy and breeding purposes. Their cattle are purchased or bred and are located in the state of Wisconsin, whence they ship annually to buyers in the state of New York upwards of 1,000 head. The defendant, Charles H. Baldwin, is Commissioner of Agriculture and Markets of the state of New York and, as such, is chief executive officer of the New York Department of Agriculture and Markets.

By section 24 of the Agriculture and Markets Law the defendant is charged with the duty of providing for the exercise of the powers and the performance of the duties of the Department of Agriculture and Markets and is authorized to make rules in respect to the same. On the 29th of August, 1932, the defendant, in pursuance of sections 72 and 74 of the Agriculture and Markets Law of the state of New York promulgated an order to take effect October 1, 1932, providing that all bovine animals coming into the state of New York should comply with the following requirements:

"All cattle over six months of age imported for dairy or breeding purposes shall come directly from herds certified to be free from Bang's disease by the chief livestock sanitary official by whatever name known, of the Country, province or state of origin. Such animals at the time of import must be accompanied by a certificate authenticated by such livestock sanitary official showing the name and address of the laboratory or person making the last blood test on such herd with a complete statement of the results of such test on the animals so imported. Such certificate shall describe each animal in such manner as to enable its identification by ear tag number, name and registration number in the case of pure breds and ear tag number in the case of grades. Such certificate shall include or be accompanied by the certificate above mentioned as to freedom of the herd from Bang's disease. A duplicate of such authenticated certificate or certificates must be filed with the Department of Agriculture and Markets, Albany, N. Y., by the consignee at the time the shipment is received, unless such duplicate has previously been filed by the consignor.

"This order shall not apply to the following classes of bovine animals:

"(a) Cattle for immediate slaughter, consigned to the public stock yards.

"(b) Steers and beef type cattle for feeding and grazing purposes."

On or about the 21st day of October, 1932, the plaintiff shipped from the state of Wisconsin to one Edgar Bartlett, at Sharon Station in the state of New York, 20 head of grade cattle for dairy or breeding purposes, all over six months of age, which at the time of their arrival at Sharon Station were accompanied by a certificate authenticated by the chief live stock sanitary official of the state of Wisconsin, showing the name or address of the laboratory or person making the last blood test on said 20 head of cattle, with a complete statement that the results of such test showed each of said animals to be free from Bang's disease. The certificate described each of the cattle in such manner as to enable its identification by ear tag and a duplicate of the certificate was filed by plaintiffs with the Department of Agriculture and Markets in Albany, N. Y., on October 23, 1932. It did not certify that the herd from which these cattle came was free from Bang's disease, and because of this fact, the plaintiffs were forbidden by the New York Commissioner of Agriculture and Markets to deliver any of them to the purchaser, Edgar Bartlett. The Commissioner ordered the railroad that transported them and still held them in custody to keep them separate from all other animals until inspection had been had and until the further order of the Commissioner, and forbade it to remove any of them from the place where they were except for immediate slaughter and forbade the sale or use of the milk from the animals until it had been heated to a specified temperature. By reason of the issuance of this last order, the plaintiffs felt obliged to reship the cattle and transported them to a point outside of the state of New York.

The bill of complaint alleged in addition to the foregoing that under the act of Congress of February 2, 1903 (21 U. S. Code, §§ 120, 121, 122 [21 USCA §§ 120–122]) and the act of Congress of March 3, 1905 (21 U. S. Code, §§ 123, 124, 125, 126 [21 USCA §§ 123–126]), Congress had assumed control of the entire field of transportation and quarantine of live stock which is the subject of commerce between the states in so far as action to prevent or lessen the spread of dangerous, contagious, infectious, or communicable diseases is concerned, and that such con-

trol by Congress excluded from the field any action by the several states in respect thereto and rendered the order of the Commissioner of Agriculture and Markets void as in contravention of the provisions of the Interstate Commerce Clause of the Constitution of the United States. The bill of complaint also alleged that the Commissioner's regulations were an undue burden upon interstate commerce and thus in violation of the Constitution.

The complaint asks for both a preliminary and a final injunction restraining the defendant and his agents from enforcing the order and from subjecting to inspection, examination, and quarantine after interstate transportation shall have been completed animals transported without a certificate that they have come from a herd free from Bang's disease.

An affidavit and the bill of complaint were submitted in support of the motion for a preliminary injunction and likewise answering affidavits were submitted on behalf of the defendants. These affidavits were by stipulation introduced at the final hearing as proofs on behalf of the respective parties.

The answering affidavits are confined chiefly to extracts from papers read at conventions of the United States Live Stock Sanitary Association and the opinions of veterinarians and others, as to the prevalence of Bang's disease among cattle and the restrictive measures taken and advocated by states, owners, and others.

From them it appears that Bang's disease is widely prevalent, is a menace to cattle, and sometimes affects the milk from such cattle.

In this memorandum, the Commissioner of Agriculture and Markets of the state of New York will hereinafter be called the State Commissioner and the order promulgated by such State Commissioner in August, 1932, will hereinafter be called the October order.

### Opinion.

It will be seen that the October order prohibits absolutely the importation into the state of New York of cattle for dairying or breeding purposes unless each animal is accompanied by a certificate that such animal comes directly from a herd, all of whose members are free from Bang's disease and that such certificate shall be made by the chief live stock sanitary official, by whatever name known, of the country, province, or state of origin of the cattle. Certain requirements for such certificates are also contained in the October order.

"Country" or "province" evidently relate to places outside of the United States, and "state" evidently refers to any state of the United States.

No matter what laws concerning interstate or foreign commerce in cattle liable to be afflicted with communicable diseases may have been enacted by the United States, such cattle may not be brought into the state of New York, except in compliance with the October order, if the order is valid.

This October order is, therefore, an interference with and a regulation of interstate and foreign commerce in cattle liable to be afflicted with contagious disease, unless it can be justified as a valid exercise of the police power of the state, only incidentally affecting such commerce.

If the United States has not exercised its power to regulate interstate commerce in such cattle, the right of the state under its reserved police power to establish a restriction on the importation into the state of such suspected cattle would not be destroyed. Reid v. Colorado, 187 U. S. 137, 23 S. Ct. 92, 47 L. Ed. 108; Oregon-Washington R. & Nav. Co. v. Washington, 270 U. S. 87, at page 101, 46 S. Ct. 279, 70 L. Ed. 482.

But the United States has acted in this respect.

In Asbell v. Kansas, 209 U. S. 251, 257, 28 S. Ct. 485, 487, 52 L. Ed. 778, 14 Ann. Cas. 1101, it is said: "Large powers to control the interstate movement of cattle liable to be afflicted with a communicable disease have been conferred upon the Secretary of Agriculture by the Act of February 2, 1903 (21 USCA §§ 120, 121 and 122) and the Act of March 3, 1905 (21 USCA §§ 123, 125 and 126)."

The provisions of the acts need not be fully stated:

"The only part of them which seems relevant to this case and the question under consideration which arises in it is contained in the law of 1903. In that law it is enacted that when an inspector of the Bureau of Animal Industry has issued a certificate that he has inspected cattle or live stock and found them free from infectious, contagious, or communicable disease, 'such animals so inspected and certified may be shipped, driven, or transported * * * into * * * any state or territory * * * without further inspection or the exaction of fees of any kind, except such as may at any time be ordered or exacted by the Secretary of Agriculture.'

"There can be no doubt that this is the supreme law, and, if the state law conflicts with it, the state law must yield."

Asbell v. Kansas thus holds that the United States has exercised its power to regulate the interstate movement of cattle which are liable to be afflicted with dangerous, infectious, contagious, and communicable diseases and has assumed control of the whole field so far as legislation is concerned.

Other decisions to the same effect, construing the same or a like statute, are: Must Hatch Incubator Company v. Patterson (D. C.) 27 F.(2d) 447; Oregon-Washington R. & N. Co. v. Washington, 270 U. S. 87, 46 S. Ct. 279, 70 L. Ed. 482.

These two cases are more fully referred to later herein.

The defendant contends, however, that the federal Secretary of Agriculture has not acted under the act of February 2, 1903, or the act of March 3, 1905, does not intend to act, and that such failure to act leaves the field unoccupied in the same manner as if these acts had never been enacted.

In his letter to the defendant under date of November 15th, 1932, the Secretary of Agriculture says, not only that he has not acted under these acts, but also that he does not intend to act, saying that "the department is disposed for the present, to leave the control of Bang's disease to the various states."

He says that "there is now before the Congress a joint resolution, H. J. 12, which would allow the States to act with regard to any animal quarantine measure until such time as the Federal Government may issue regulations on the same subject matter. This department is in sympathy with the provisions of that resolution."

If the statements concerning Bang's disease, its prevalence and effect upon cattle and upon the milk consumed by human beings, with which the answering affidavits are replete, be true, it is the duty of the Secretary to act, for he must "have reason to believe that such disease may exist" in Wisconsin, which seems to be a cattle raising state.

He is by the acts of February 2, 1903, and March 3, 1905, not only authorized but "directed" to act in such circumstances and to make regulations concerning the exportation and transportation of cattle from any place within the United States through any state or territory.

The exercise of the constitutional power to regulate commerce must be by the Congress and the Congress alone. No executive officer, empowered and directed to carry out the provisions of such legislation, may thwart the will of Congress by failing to carry out its mandates.

Public officers are presumed to do their duty and may not render legislation ineffective and inoperative by neglecting to execute the directions of Congress, however praiseworthy or righteous their motives may be in so doing, unless specifically authorized not to act by action of the Congress itself. The Congressional Resolution now pending and favored by the Secretary of Agriculture will upon adoption, doubtless be such authorization. Until adopted there is no such authorization.

The case of Oregon-Washington R. & N. Co. v. Washington, 270 U. S. 87, 46 S. Ct. 279, 70 L. Ed. 482, decides, however, that whether the Secretary of Agriculture acts or does not act, the act of Congress itself is controlling and occupies the field to the exclusion of the state authority.

In that case the authorities of the state of Washington discovered the existence in adjoining states of an alfalfa boll weevil pest, which fed upon the leaves of the plant to the great damage of the crop and that "there was danger that transportation of alfalfa in box cars would carry the pest into the State of Washington." They thereupon made a state quarantine regulation pursuant to state statute, prohibiting the transportation of alfalfa into the state except in sealed containers.

The Oregon-Washington Railway & Navigation Company disregarded this state quarantine regulation and transported alfalfa in box cars from the infected states into the state of Washington. The state brought an action against the railway company in the state court for an injunction, to restrain such transportation of alfalfa in box cars, which was granted and affirmed by the highest court of the state. 128 Wash. 365, 223 P. 600. Appeal was taken by the defendant to the United States Supreme Court.

There the court first considered the question whether or not the federal legislation occupied the field to the exclusion of the state police power.

After discussing the federal legislation under which the court held, in Reid v. Colorado, 187 U. S. 137, 23 S. Ct. 92, 97, 47 L. Ed. 108, that the United States had not occupied the field, the court said (page 101 of 270 U. S., 46 S. Ct. 279, 283):

"The act we are considering is very different. It makes no reference whatever to co-operation with state authorities. It proposes the independent exercise of federal authority with reference to quarantine in interstate commerce. It covers the whole field so far as the spread of the plant disease by interstate transportation can be affected and restrained. With such authority vested in the Secretary of Agriculture, and with such duty imposed upon him, the state laws of quarantine that affect interstate commerce and thus federal law, cannot stand together. The relief sought to protect the different states, in so far as it depends on the regulation of interstate commerce, must be obtained through application to the Secretary of Agriculture.

"In the relation of the states to the regulation of interstate commerce by Congress there are two fields. There is one in which the state cannot interfere at all, even in the silence of Congress. In the other, and this is the one in which the legitimate exercise of the state's police power brings it into contact with interstate commerce, so as to affect that commerce, the state may exercise its police power until Congress has by affirmative legislation occupied the field by regulating interstate commerce and so necessarily has excluded state action. * * *

"But when Congress has acted and occupied the field, as it has here, the power of the states to act is prevented or suspended."

The court then passed upon the identical contention made there, as here, that if the Secretary of Agriculture did not act, the effect was the same as if Congress has not acted at all, leaving the state free to act.

That court said at page 102 of 270 U. S., 46 S. Ct. 279, 284: "It is suggested that the states may act in the absence of any action by the Secretary of Agriculture, that it is left to him to allow the states to quarantine, and that if he does not act there is no invalidity in the state action. Such construction as that cannot be given to the federal statute. The obligation to act without respect to the states is put directly upon the Secretary of Agriculture, whenever quarantine, in his judgment, is necessary. When he does not act, it must be presumed that it is not necessary. With the federal law in force, state action is illegal and unwarranted."

While this case construes the plant quarantine act of August 20, 1912, as amended in 1917 (7 U. S. Code, c. 8 [7 USCA § 151 et seq.]), that statute is substantially like the acts of February 2, 1903, and March 3, 1905, in its essential provisions directing the Secretary of Agriculture to act and the case decides the precise question here involved.

The defendant calls this Oregon-Washington Case an exceptional one but it is exceptional only in that it is the first Supreme Court case which has expressly decided that the failure of the Secretary of Agriculture to act has no bearing on the scope or operation of the statute. In other respects it declares the supremacy of the federal authority in the exercise of its constitutional power to regulate interstate commerce, in harmony with preceding and succeeding cases.

Some of these cases are: Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101, supra; Northern Pacific Railway Company v. Washington, 222 U. S. 370, 32 S. Ct. 160, 56 L. Ed. 237; Southern Railway Co. v. Railroad Commission, 236 U. S. 439, 35 S. Ct. 304, 59 L. Ed. 661; New York Cent. R. Co. v. Winfield, 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139; Napier v. Atlantic Coast Line R. Co., 272 U. S. 605, 47 S. Ct. 207, 71 L. Ed. 432; Missouri Pacific Railway Company v. Porter, 273 U. S. 341, 47 S. Ct. 383, 71 L. Ed. 672.

This Oregon-Washington decision was handed down March 1, 1926. On April 13, 1926, Congress amended section 8 of this statute (7 USCA § 161) by providing that until the Secretary of Agriculture does act, the state police regulations may be enforced as if there were no federal act.

The case of the Must Hatch Incubator Company v. Patterson, Governor of Oregon (D. C.) 27 F.(2d) 447, is also precisely in point and upon the statutes here involved and in strict analogy, because there as here, the Secretary of Agriculture had not acted. In that case the injunction was granted by a statutory federal court of three judges against a state regulation prohibiting the importation into the states of Oregon and Washington of baby chicks unless accompanied by a health certificate showing that they have come from parent stock which has been found free from bacillary white diarrhea by application of the agglutination test, within twelve months immediately prior to their importation or other such tests as may be prescribed or approved by the Bureau of Animal Industry of the Department of Agriculture of the United States. It will be noticed how strikingly like the October order here the Washington regulation was, and it also included a reference to tests prescribed by

the federal authorities, which is not the case here.

At least one state court case is to the same effect. That is State v. Chicago, Milwaukee & St. Paul R. R., 200 Mo. App. 109, 206 S. W. 419, 421, where the railroad had been convicted of a violation of a state cattle quarantine order and where there had been no action taken by the Secretary of Agriculture. The conviction of the railroad company was reversed and the court said:

"But it is insisted by the state that until the Secretary of Agriculture acts under the authority given him by Congress * * * the superior authority of Congress could not be considered to have been asserted * * * we think that is a mistaken view of what Congress did and intended. When Congress, by the act above referred to 'directed' the Secretary of Agriculture * * * it assumed control of the subject.

"By such statute Congress affirmatively and exclusively occupied the field."

Defendant's main support for his contention is this same case, Asbell v. Kansas, 209 U. S. 251, 28 S. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101, supra. He urges that this case holds that the Kansas state inspection law is valid and does not invade the federal field of interstate commerce. Hence, argues defendant, the October order, which is like the Kansas statute, is valid.

In this the defendant errs.

The statute before the court in Asbell v. Kansas was a penal statute, apparently a single section of the state law, viz., section 27, chapter 495, of the Session Laws of 1905.

This statute made it a misdemeanor, punishable by fine or imprisonment, or both, for any one to bring into Kansas cattle from any point south of the state without having first caused them to be inspected and passed as healthy by the Bureau of Animal Industry of the United States or by the proper officials of the state of Kansas. It may be taken that there were other provisions of state law elsewhere enacted for inspection as to the health of the cattle, but these provisions were not discussed by the court.

The court said, as to the question before it for decision: "The only Federal question insisted upon in argument is whether the statute was a restriction of interstate commerce which was not within the power of a state to impose."

After referring to the act of February 2, 1903, as legislation by Congress covering this very subject, in words which have already been quoted herein, the court decided the question before it in the following language concerning that act: "There can be no doubt that this is the supreme law, and, if the state law conflicts with it, the state law must yield. But the law of Kansas now before us recognizes the supremacy of the national law and conforms to it. The state law admits cattle inspected and certified by an inspector of the Bureau of Animal Industry of the United States, thus avoiding a conflict with the national law."

It is clear, therefore, that the Asbell v. Kansas Case passes only upon the penal section of the state inspection statute, which section accepts the federal certificate and thus avoids conflict with the federal act.

It decides only that the state may, under its own penal law, punish those who bring cattle into the state uninspected by state or federal authority, so long as the state law does not invade the domain of, or conflict with, the federal authority over interstate commerce but recognizes it as supreme, and expressly protects from penalty under the state law, any one who brings cattle into the state under the provisions of the federal law.

True, the court does not strike down the state act as invalid because invading a field exclusively occupied by federal law. It recognizes that a state may have a state inspection law, as decided in Reid v. Colorado, supra, therein discussed and later in the Oregon-Washington Case, supra, so long as it does not invade the federal field of interstate commerce, conflict with federal law, or affect interstate commerce other than incidentally.

There is nothing in this decision from which an inference can fairly be drawn that a state statute like the October order, or any state inspection statute, is valid when it conflicts with and overrides the federal law regulating interstate commerce in cattle liable to be afflicted with contagious disease, nor that the federal law does not fully occupy the field at all times.

The Asbell v. Kansas Case directly holds to the contrary.

The defendant suggests that the act of 1903 involved in the Asbell v. Kansas Case differs from the acts of 1905 and 1912 as amended in 1917 and that such difference differentiates the Oregon-Washington and Must Hatch Cases from Asbell v. Kansas.

The fact is that the act of 1903 is the basis of decision in both the Asbell v. Kansas and the Must Hatch Cases.

The similarity, bordering on identity of expression in all these sessions is manifest.

The words "when he may have reason to believe disease exists" in the 1903 act (21 USCA § 120); the words "when he shall determine the fact that cattle * * * are affected with * * * disease" in the 1905 act (21 USCA § 123); the words "when he shall determine the fact that a dangerous plant disease * * * exists" in the 1912 act (37 Stat. 318, § 8) changed by the amendment of 1917 (7 USCA § 161) to read "when he shall determine that such quarantine is necessary to prevent the spread of a dangerous plant disease," are substantially synonymous in meaning. The act of 1903 provides what the certificate of health of cattle shall contain and makes such certificates supreme over all other inspection. The acts of 1905 and of 1917, leave the inspection and certification to rules and regulations to be made by the Secretary of Agriculture.

The general scheme of all these statutes is the same. They all alike provide that whenever the conditions warrant or require action, the Secretary of Agriculture shall act and provide for inspection and certificates of health for shipment out of quarantine areas or areas where he has reason to believe disease may exist.

It is no part of the plan or scheme of these statutes that the Secretary shall have any discretion to permit the states to act in his stead or to substitute state for federal action if and when he thinks state action more advisable, more efficient or less expensive to the federal government. The conclusive presumption must always be that he will act if occasion requires and that if he does not act it is not necessary to act. The states may not at any time decide that action is necessary contrary to the presumed decision of the Secretary. Congress and Congress alone can relieve the Secretary from the duty of acting when conditions require action. This was done as to statute involved in the Oregon-Washington Case by the resolution passed one month and thirteen days after that decision. If it adopts the resolution now pending and recommended by the Secretary, it will also relieve him as to the act of 1905 and possibly also the act of 1903.

If the October order were nothing more than a valid penal statute and had contained a like provision permitting the importation of cattle inspected and certified by the Inspector of the Bureau of Animal Husbandry of the United States, as the Kansas statute did, there would be no conflict with the federal statute and it might come within the decision of the Kansas Case.

But the October order contains no such provision and was intended to contain none. It was intended not to accept any federal inspection certificate whether the Secretary of Agriculture acted or not, but to advance the requirements for admission of cattle to the state beyond those possible under the federal law and to exclude all not coming from a herd, all of whose members were certified by state authority to be free from Bang's disease.

The case of Whipp v. U. S. (C. C. A.) 47 F.(2d) 496, 498, is also cited in support of this contention. Whipp and others were convicted of conspiracy to violate the Federal Criminal Code (18 USCA § 118) by resisting federal officers attempting to make a test of cattle. The case did not involve the question here for the cattle were not in interstate commerce. The conviction was reversed for the reason that, as stated by the court: "Investigation by the making of tests solely to determine the existence or nonexistence of communicable diseases in cattle which are not shown to have entered, or to be about to enter, the stream of interstate commerce, lies exclusively within the domain of the police power of the state."

It is also argued that these acts of February 2, 1903, and March 3, 1905, are not acts of general operation but operate only when the Secretary of Agriculture has "reason to believe" under the act of February 2, 1903, contagious disease exists in certain areas or "shall determine" that such disease exists in any state under the act of 1905, that then and then only, is he empowered to apply regulations to such area, and that it is only when cattle are about to be transported out of such areas that the inspectors of the Bureau of Animal Industry are authorized to issue certificates, while at all other times the federal act is not operative, the state regulation and inspection remain exclusively in effect, and there is no conflict with the federal power.

It is said that the contention finds support in Atchison, T. & S. F. R. Co. v. Railroad Comm., 283 U. S. 380, 391, 393, 51 S. Ct. 553, 556, 75 L. Ed. 1128; Savage v. Jones, 225 U. S. 506, 533, 32 S. Ct. 715, 56 L. Ed. 1182; Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 625, 18 S. Ct. 488, 42 L. Ed. 878.

This argument that the statutes of 1903 and 1905 are not of general operation and are inapplicable to this case for the reason above stated seems but another way of say-

ing that the federal government has not occupied the field to the exclusion of state authority unless the Secretary of Agriculture acts, and this has already been discussed herein.

These three cases cited by defendant must be read in the light of the statutes and questions before the court, and will be found not to fairly support the contention that the acts of 1903 and 1905 are not of general application within their scope.

In the Atchison Case, it is said: "Such an intention to override existing state authority to deal with local exigencies is not to be imputed to the Congress unless its enactment compels that conclusion."

The statute there was the federal railroad law of 1920 and the question was whether or not it gave to the Interstate Commerce Commission full control over the construction of a Union Railroad Station in Los Angeles.

The court held that the federal statute merely required the approval by the Interstate Commerce Commission for the construction of union stations, and, so far as approval was concerned, was supreme, but, going no further, it was not in conflict with the power of the state to compel construction of a union station once the approval of the Interstate Commerce Commission had been obtained.

There was no question of the general as distinguished from the limited or occasional operation of the statute there. There was question as to how much of the field of control the railroad law covered. But so far as it went, it was of general and universal operation. The decision merely determined its scope.

The case of Savage v. Jones, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182, relates to a statute of Indiana, requiring articles of animal food offered for sale within the state to be certified by the state chemist to comply with the state statute and to be stamped with stamps so stating, issued by the state chemist and paid for by the seller. The state statute applied to animal foods manufactured within the state, as well as those shipped into the state from other states.

The out of state plaintiff contended that the state statute was in conflict with the Federal Food and Drugs Act of June 30, 1906 (21 USCA § 1 et seq.) but the court held that the federal statute had not included that at which the Indiana statute aims, did not cover the same field, and that there was no conflict.

The Supreme Court said of the state act at page 524 of 225 U. S., 32 S. Ct. 715, 722: "It was not aimed at interstate commerce, but without discrimination, sought to promote fair dealing in the described articles of food."

The difference between the Indiana statute thus defined and the October order, which does relate, and exclusively, to interstate and foreign commerce, is clear.

Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 18 S. Ct. 488, 42 L. Ed. 878, supra, involved the validity of a judgment recovered by a resident cattle owner against a railway for damages caused by its having brought into the state certain cattle alleged to have been afflicted with Texas fever, which was communicated to the cattle of plaintiff. The judgment was based upon the common law and a state statute which made actionable the driving or transporting into the state of cattle, which were liable to communicate fevers.

The federal statutes there involved were not the acts of 1903 and 1905, but were the same prior statutes which were held in Reid v. Colorado, supra, not to occupy the field.

The Supreme Court held that neither the federal law nor the regulations of the Secretary of Agriculture issued thereunder exempted the railroad from such civil liability, and, therefore, did not occupy the field covered by the state statute.

The court said: "The act of Congress left the state free to cover that field by such regulations as it deemed appropriate, and which only incidentally affected the freedom of interstate commerce."

These three cases relate to other statutes and hold that there was no federal legislation covering the same field as the state statute (except the matter of federal consent in the Atchison Case). They do not hold, nor warrant the inference, that the federal legislation fully occupying the field was existent, but was generally operative only at times and inoperative at other times, depending upon whether the federal officer charged with their execution did or did not act.

The same contention was made by counsel on the Oregon-Washington Case, supra, that the act of Congress there involved (August 20, 1912, as amended March 4, 1917) "was not intended to cover the entire field" and was not of general operation. Page 89 of 270 U. S., 46 S. Ct. 279, 283. But the court dismissed that contention in the words

"it covers the whole field." Page 101 of 270 U. S., 46 S. Ct. 279, 283.

The case of U. S. v. Johnson, 35 F.(2d) 256 (D. C. Nev.) is also claimed to support this contention.

That was a criminal case where the defendant was charged with driving cattle from his ranch in Nevada to his adjoining ranch across the state line in California without having them tested and certified under a regulation issued by the Secretary of Agriculture prohibiting the shipment interstate of any cattle unless they were subjected to a physical examination and tuberculin test and certified to be free from contagious, infectious, and communicable diseases.

There was no proof that such disease existed among cattle in Nevada nor that the particular cattle were diseased.

The district court of Nevada sustained demurrer to the indictment on the ground that the regulations were not limited to cattle which had been quarantined or cattle in localities where the Secretary of Agriculture had reason to believe disease existed, but ran to all cattle, diseased or not diseased, exceeded the power given him by statute and were void, or at least not applicable to defendant.

It will be seen that all that the court decided was the scope of the regulations under the penal provision of the federal statute. The court did not directly decide the question whether the federal statute fully occupied the field of transportation of diseased cattle in interstate commerce, which is the discussion here. None of the cases bearing on this point were discussed in the opinion.

Even if this case seems to warrant such an inference, it is out of harmony with Thornton v. United States, 271 U. S. 414, 46 S. Ct. 585, 70 L. Ed. 1013, in which the defendants were indicted for assaulting and interfering with employees of the Bureau of Animal Husbandry, in carrying out like regulations of the Secretary of Agriculture relating to the inspection of cattle suspected of having contagious disease.

The facts have much similarity and the conviction was sustained in the Thornton Case. This case, decided in 1926, was not referred to in the Johnson Case, decided in 1929.

It was urged on the argument that the state statute, under which the October order was promulgated by the State Commissioner, recognizes and accepts the federal certificate by subdivisions 3 and 4 of section 74 ·of the Agriculture and Markets Law of the state,

which is entitled "regulations relating to importation" and that the October order thus avoids conflict and comes within Asbell v. Kansas.

Subdivision 1 provides: "No person shall knowingly bring into this state any domestic animal which has an infectious or communicable disease. * * *"

Subdivision 2 provides: "Any person bringing into this state domestic animals for any purpose other than immediate slaughter without taking precaution to ascertain whether such animals have an infectious or communicable disease shall be presumed to have brought them in knowingly in violation of this section, if they are found to have such disease."

Subdivision 3 recognizes federal supervision and reads as follows: "Animals received from outside the state under the supervision of the United States department of agriculture or the department of farms and markets of the state of New York, or for which a permit * * * shall have been issued by either of such departments, shall be deemed to have been handled with due precaution."

Subdivision 4 also recognizes federal inspection and certificate: "Any person importing or bringing into this state neat cattle for dairy or breeding purposes shall report immediately upon bringing such cattle into the state to the department, in writing, stating the number of cattle thus brought in, the places where they were procured, the lines over which they were brought, their destination within the state and when they will arrive thereat; and if there be filed with the department at the time of filing such report or within ten days thereafter, a certificate by a duly authorized veterinary practitioner approved by the authorities of the state in which he resides or by an authorized veterinary inspector of the United States bureau of animal industry to the effect that he has duly examined such animals and that they are free from any infectious or communicable disease, the commissioner may issue a permit to such person to remove such cattle immediately. Otherwise such person shall detain such animals at the point of destination for at least twenty days for inspection or examination by the commissioner or his duly authorized agent. The provisions of this subdivision relating to advance reports to the department shall not apply to cattle imported into this state at a point where there is federal inspection."

The state statute accepts the federal inspection and certificate of the health of the

individual animal and receives such animal as lawfully imported.

But the October order excludes and ignores federal inspection and certificate entirely, whether the Secretary of Agriculture has acted or not acted, and excludes all animals which are not certified by the chief live stock sanitary official of the state of origin, to be disease free and to have come from a disease free herd. Clearly this conflicts with section 74 of the New York State Agriculture and Markets Law.

The question whether or not an order of a state officer transcends his statutory authority is ordinarily a state and not a federal question so long as the order does not invade the exclusive field of federal authority.

But when the October order seeks to regulate interstate shipments into the state, of cattle liable to be affected with communicable disease and not only transcends the state statute but conflicts with it, the question whether the order can be said to be a valid exercise of the reserved state police power becomes a federal question.

It is argued that this October order, though admittedly invalid as to cattle certified to be free from disease by inspectors of the Bureau of Animal Industry and admissible under the federal statutes referred to, should be held otherwise valid, and, in particular, valid as against the plaintiffs, because they hold no such federal certificate.

This contention is based upon the doctrine of statutory construction that a statute must be read in the light of the Constitution, which binds the legislative body, that, however broad and general its language, the statute cannot be interpreted as extending beyond those matters which it is within the constitutional power of the Legislature to reach, and that when the constitutional part may be separated from the unconstitutional part, the former is valid and may be enforced. McCullough v. Virginia, 172 U. S. 102, 19 S. Ct. 134, 43 L. Ed. 382.

This doctrine is based upon the assumption that the Legislature acted in good faith and without knowledge that it was including unconstitutional as well as constitutional objects within its enactment or intention to do so.

An executive officer issuing regulations pursuant to statute has his path plainly laid out for him by the statute which gives him authority, and, if he transgresses and conflicts with its plain terms, he is entitled to no assumption that he did so inadvertently. His regulation may at any time be withdrawn, modified, and reissued without delay, difficulty, or the operation of any cumbersome legislative machinery.

Here there can be no assumption that the State Commissioner acted inadvertently for it is clear that the October order was the result of an understanding between the Secretary of Agriculture and the State Commissioner to the effect that the Secretary of Agriculture would permit no federal certificates to be issued, but would leave the entire matter to the states, and that the October order would exclude cattle which would be admissible under state statute, if the Secretary of Agriculture had acted as directed by the federal statute to do.

Nor is this October order a divisible one, enforceable as to its alleged valid and constitutional parts and invalid as to the remainder. It is one and indivisible. It is claimed to be valid and applicable to cattle when the federal Bureau of Animal Husbandry is not ready to issue health certificates for such cattle and invalid when the bureau is ready to issue such certificates though the cattle be the same and be free from disease at both times.

Such a statute or regulation, uncertain and variable in its application, broader than warranted by the authority under which it was enacted, and penal in its nature is invalid.

The October order comes under all these objections. It is made penal in its nature by sections 40 and 41 of the Agriculture and Markets Law of the state. U. S. v. Reese, 92 U. S. 214, 221, 23 L. Ed. 563; Trade-Mark Cases, 100 U. S. 82, 98, 25 L. Ed. 550; U. S. v. Harris, 106 U. S. 629, 641, 1 S. Ct. 601, 27 L. Ed. 290; Illinois Central R. Co. v. McKendree, 203 U. S. 514, 530, 27 S. Ct. 153, 51 L. Ed. 298. See, also, Employers' Liability Cases, 207 U. S. 463, 28 S. Ct. 141, 52 L. Ed. 297; U. S. v. Johnson (D. C.) 35 F.(2d) 256.

The defendant asserts, however, that even if it is invalid as to others, it is valid as to plaintiffs for they hold no federal certificate for their cattle and may not be heard to question its invalidity as to others.

But if it were not for the co-operation between the defendant and the Secretary of Agriculture, the Secretary of Agriculture refusing to act when he should act, the plaintiffs would hold such certificates.

The plaintiffs may not be denied, because, deprived of their rights, they have no health certificate. And the defendant should be held

estopped from invoking against the plaintiffs the plight in which they unavoidably find themselves when that plight is the consequence of the act of the defendant in cooperation with the Secretary of Agriculture intended to bring about that very plight.

It follows then, that the October order cannot be said to be valid exercise of the state police power since it excludes from the state cattle which have been inspected and certified by an Inspector of the Bureau of Animal Husbandry, while the state Legislature, which alone can exercise the state's police power, has in its enactment of section 74 expressly directed that cattle so inspected and certified may be received into the state.

Plaintiffs contend that the October order is a burden on interstate commerce and invalid for that reason also. Defendant asserts that it is not discriminatory and applies to all states alike outside of New York.

But it does discriminate in favor of New York cattle dealers and against all others. True, there is inspection provided by state law for New York state cattle, but there is no requirement in such inspection that to be sold in the state they shall come from a herd, all of whose members are free from Bang's disease. The October order requires this of imported cattle but not of domestic cattle.

While Hannibal & St. J. Railroad Company v. Husen, 95 U. S. 465, 24 L. Ed. 527, one of the cases on which plaintiffs rely, involves a categorical prohibition of all importations during nine months of the year and is not analogous, there are other authorities which do support plaintiffs' position.

State statutes which provide for inspection of imported products not required of local products have been held invalid because discriminatory and burdensome upon interstate commerce. Minnesota v. Barber, 136 U. S. 313, 10 S. Ct. 862, 34 L. Ed. 455; Brimmer v. Rebman, 138 U. S. 78, 11 S. Ct. 213, 34 L. Ed. 862; Voigt v. Wright, 141 U. S. 62, 11 S. Ct. 855, 35 L. Ed. 638.

So it has been held that state statutes imposing a tax on imported products which is not also imposed on state products are invalid. Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347; Darnell & Son Company v. Memphis, 208 U. S. 113, 28 S. Ct. 247, 52 L. Ed. 413.

The principle is the same whether the discrimination relate to tax inspection or any other thing which affects things within the state differently from those coming therein through interstate commerce. Schollenberger v. Pennsylvania, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49; International Text-Book Company v. Pigg, 217 U. S. 91, 112, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Sioux Remedy Company v. Cope, 235 U. S. 197, 35 S. Ct. 57, 59 L. Ed. 193; Dahnke-Walker M. Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239; Helson & Randolph v. Com. of Kentucky, 279 U. S. 245, 49 S. Ct. 279, 73 L. Ed. 683.

Though there is no proof on the subject, the October order may impose such a burden upon interstate commerce in cattle that the resulting instability, hazard, and lessening of opportunity for profit will substantially destroy the business of shipping cattle into New York state.

If a single animal in a herd of 50 or 100 were affected, no member of the herd could be given the certificate required by the October order.

If that one were withdrawn from the herd, some substantial amount of time must elapse before the remaining animals could be again examined for the required herd free certificate and added expense would be involved. If, in the meantime, another member of the large herd should be afflicted, another long delay and expense would be entailed. Such uncertainty, delay, and expense is likely to banish all profit and make competition with New York cattle raisers, free from such handicap, practically impossible.

The October order, then, is an invasion of the field of interstate commerce already fully covered by the federal law, prescribes requirements greater than the Secretary of Agriculture could make, were he to act under the federal law, and is invalid; it is not an exercise of the state police power by the state Legislature in which alone that power resides, but is an illegal and unauthorized attempt to exercise that power by an executive officer in conflict with and in violation of the very statute under which alone he has power to make regulations; it is a discrimination against citizens of all other states in favor of citizens of New York and is a burden upon interstate commerce.

The result sought to be attained by the October order is highly commendable and appeals to all the members of the court.

But the courts cannot be influenced by such consideration to uphold invalid exercise of authority. The courts must declare the law as they find it, leaving the remedy for newly discovered emergencies in interstate

commerce in cattle, real or fancied, to the law-making power of the federal government.

The injunction sought should be granted.