M. O. SIMS et al., Plaintiffs,

R. E. Farr et al., Intervening Plaintiffs,

United States of America, Plaintiff and Amicus Curiae,

v.

Agnes BAGGETT, Secretary of State of the State of Alabama, et al., Defendants.

Civ. A. No. 1744-N.

United States District Court
M. D. Alabama, N. D.

Oct. 2, 1965.

Charles Morgan, Jr., Birmingham, Ala., Robert H. Loeb, Birmingham, Ala., for plaintiffs.

Cooper, Mitch, Johnston & Crawford, Jerome Cooper, Birmingham, Ala., for R. E. Farr, Marshall Meadows, Jack Hopping, Jack Ryan and Max W. Morgan.

David J. Vann, Robert S. Vance and C. H. Erskine Smith, Birmingham, Ala., for David J. Vann, Robert S. Vance, and Richard P. Humphrey, Jr.

Ben Hardeman, U. S. Atty., Montgomery, Ala., John Doar, Asst. Atty. Gen., Civil Rights Division, Department of Justice, Washington, D. C., and Charles Nesson, Attorney, Department of Justice, Washington, D. C., for plaintiff and amici curiæ.

Richmond M. Flowers, Atty. Gen., State of Alabama, Montgomery, pro se, and for Secretary of State.

Boswell & Smith, Geneva, Ala., for Harrell Hammonds.

Roy D. McCord and H. G. Rains, Gadsden, Ala., for Roy Mayhall and H. G. Rains.

T. G. Gayle, J. E. Wilkinson, Jr., McLean Pitts, Selma, Ala., and Rankin Fite, Hamilton, Ala., for B. A. Reynolds and Frank Pearce.

Before RIVES, Circuit Judge, and THOMAS and JOHNSON, District Judges.

PER CURIAM:

In our earlier opinion and decision,[1] we reapportioned both Houses of the Alabama Legislature only moderately and provisionally in the hope that the strangle hold would be broken and that the Legislature would then provide for a true reapportionment. The Supreme Court affirmed the judgment of this Court and remanded this case for further proceedings consistent with the views stated in its opinion.[2]

That opinion specifically directed this court "to take some further action should the reapportioned Alabama Legislature fail to enact a constitutionally valid, permanent apportionment scheme in the interim * * *," that is, in time to be used as the basis for conducting the 1966 election of the Alabama legislators. This court's decision was rendered on July 21, 1962, and the date of affirmance by the Supreme Court was June 15, 1964. Both this court and the Supreme Court recognized, as stated by the Supreme Court, "that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." That time has now arrived. Since the decision of the Supreme Court, the Legislature of Alabama has met in regular session and has adjourned without enacting any reapportionment measure. The Legislature has been convened in special session and in that special session it has enacted bills to reapportion both houses. Each of those Acts is entitled to the most careful scrutiny and consideration by this court.

If either does not conflict with the controlling provisions of the Constitution of the United States and of the Constitution of Alabama, then, as to that house, the Legislature will have met its primary responsibility, and the labors of this court will be at an end.

The constitutionality vel non of the Acts of the Legislature of Alabama should be promptly determined. The time for the qualification of candidates in the 1966 nomination and election of the Alabama legislators is approaching.

In view of the foregoing considerations, the Judges of this court have studied the problems involved over the several years that this action has been pending. Since the pretrial hearing on the 25th of August, this case has received concentrated and intense study and deliberation by each of the Judges. This court is now prepared to decide this case and feels that its final decision should not be delayed.

The Supreme Court, in its opinion remanding these cases for further proceedings, carefully outlined the general principles which should govern the action of this court. We briefly restate those principles.

The rights impaired by malapportionment are individual and personal in nature. Under the Equal Protection Clause of the Fourteenth Amendment, one person's vote must be worth as much as that of any other person, so far as is practicable. " * * * the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote."

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of

---

1. Sims v. Frink, M.D.Ala.1962, 208 F.Supp. 431.

2. Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

a bicameral state legislature must be apportioned on a population basis." [3]

The Supreme Court recognized that:

" * * * [M]athematical nicety is not a constitutional requisite * * *. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement.

* * * [I]t may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. * * * Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting. * * * A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. * * * And apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house. * * * Arguments for allowing * * * deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing. * * * A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. * * * We agree with the view of the District Court that state constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible. * * * When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls."

■ The three sentences last quoted require us to consider instances of unavoidable conflict between the Constitution of the United States and the Constitution of Alabama. One such instance, on which all of the parties are agreed, involves the concluding proviso of section 199 of the Constitution of Alabama which reads: " * * * provided, that each county shall be entitled to at least one representative." Five Justices of the Supreme Court of Alabama in an advisory opinion to the House of Representatives of Alabama, filed September 6, 1965, said:

"It follows that we must say, in all candor, that we believe that the quoted proviso in Section 199 has been held to be violative of the equal protection clause of the Federal Constitution in the Reynolds case, and is therefore, not controlling as to any plan the Legislature might evolve in trying to meet the guidelines set out in the Federal Court decisions."

In a separate opinion, Justice Coleman advised that the House Bill, which was

3. Fortunately, as noted in our earlier opinion, the dominant or controlling requirement of the Alabama State Constitution is also that "Representation in the legislature shall be based upon population * * *." Section 284 of the 1901 Constitution of Alabama.

later enacted, does violate section 199 of the Constitution of Alabama.[4]

■■ The quoted proviso, on its face, does not conflict with the Federal Constitution. We think that the Supreme Court's opinion in Reynolds v. Sims, supra, does not render that proviso wholly inoperative. The quoted proviso in section 199 [5] and its companion section 198 [6] are intended to insure that each of the counties as a political unit of the State have separate representation in the House. It is apparent that the framers of the Constitution had at least two purposes in mind: First, to prevent gerrymandering, and, second, to insure compact geographic districts with legislators attuned to local problems. Intelligent and meritorious purposes are not enough to sustain application of this initially valid constitutional provision to counties whose population falls below the minimum required for valid reapportionment, or to counties of larger population whose joinder into a single district becomes necessary to reapportionment based on population. In those instances, the proviso as applied contravenes the Federal Constitution. In instances where the proviso can be applied without bringing about a conflict with federal constitutional requirements, the proviso remains operative.[7]

In Mintz v. Baldwin, 2 F.Supp. 700, 705 (N.D.N.Y.1933), Judge Augustus Hand explained the principles as follows:

"It is well settled that a statute may be constitutional as applied to one set of facts and unconstitutional as applied to another. [citations omitted] And this is so, not only when the unconstitutional operation of the statute is the result of a distinct and grammatically separable provision, but also when it is the result of general prohibitory language contained in a single clause, *provided the intent of the Legislature will not be violated by allowing the statute to operate in a limited field.* [citations omitted] * * *.

* * * * * *

*"To enforce the order within constitutional limits will in no way violate the intent with which it was promulgated.* Though it could not constitutionally operate upon * * [some persons], the plaintiff * * has not brought himself within the class of persons on whom it could

---

4. It may be important to note that an advisory opinion of the individual Justices is not the opinion or decision of the Supreme Court of Alabama in its judicial capacity. See Title 13, § 35 of the 1940 Code of Alabama; In re Opinions of the Justices, 209 Ala. 593, 96 So. 487.

5. Section 199 reads in part "that each county shall be entitled to at least one representative."

6. Section 198 reads in part as follows: "The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state * * *."

7. See Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 210, 55 S.Ct.

187, 79 L.Ed. 281 (1934); Concordia Fire Insurance Co. v. Illinois, 292 U.S. 535, 545, 54 S.Ct. 830, 78 L.Ed. 1411 (1934); Smiley v. Kansas, 196 U.S. 447, 454–55, 25 S.Ct. 289, 49 L.Ed. 546 (1905); Capooth v. United States, 238 F.Supp. 583 (S.D.Tex.1965); Shuttlesworth v. Birmingham Board of Education, 162 F.Supp. 372 (N.D.Ala.1958), aff'd 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145 (1958); Lovett v. United States, 66 F. Supp. 142, 145, 104 Ct.Cl. 557 (1945), aff'd 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); United States v. Rock Royal Co-op, 26 F.Supp. 534, 549–551 (N.D.N.Y.1939), modified on other grounds, 307 U.S. 533 (1939); Mintz v. Baldwin, 2 F.Supp. 700, 705 (N.D. N.Y.1933); Connor v. Board of Com'rs of Logan County, Ohio, 12 F.2d 789, 795 (S.D.Ohio 1926); cf. Watson v. Buck, 313 U.S. 387, 396–397, 402–403, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

not constitutionally operate. He cannot be heard to complain that the order is unconstitutional as applied to others. [citations omitted.]" (Emphasis added.)

The test of whether a statute or state constitutional provision should still be applied in all instances which do not contravene the Federal Constitution, as explained by Judge Hand, supra, is no different than that laid down by the Supreme Court for judging the severability of separate clauses. In Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), Justice Black speaking for the Court adopted a test as follows (313 U.S. at 396–397, 61 S.Ct. at 965):

> " 'The test to determine workability after severance, and whether the remainder of the act should be upheld rests on the fact of whether or not the invalid portion is of such import that the valid part would be incomplete or would cause results not contemplated by the Legislature.' Louis K. Liggett Co. v. Lee, 109 Fla. 477, 481, 147 So. 463; 149 So. 8, 9."

Applying the logic of these principles to the instant facts requires that the protective effect of the concluding proviso of section 199 should be stayed only where the Federal Constitution requires. Enforcement of the concluding proviso of section 199 to the extent that it will not conflict with the Federal Constitution in no way violates "the intent with which it [that proviso] was promulgated" nor does it cause a result "not contemplated" by the framers of the Alabama Constitution. In fact the limited application of section 199 continues to effectuate its purpose.

It is only when application of the quoted proviso brings about an unavoidable conflict that the Supremacy Clause controls. There may be, and, indeed, as we shall later point out, there are instances in which the population of a county entitles it to at least one representative. Further, deference to the spirit of the quoted proviso would require that there be as few multi-county House districts as is practicable, and in instances where multi-county House districts are unavoidable, the counties to be joined should, so far as practicable, be those which would require a minimum number of representatives. The departure from application of the quoted proviso should not extend further than is required by application of the Federal Constitution.

Another instance of unavoidable conflict between the Constitution of the United States and the Constitution of Alabama involves section 200 of the Constitution of Alabama:

> "Sec. 200. It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and *to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more;* and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. *No county shall be divided between two districts,* and no district shall be made up of two or more counties not contiguous to each other." (Emphasis supplied.)

As was noted in our earlier opinion (208 F.Supp. at 442), reapportionment of the Senate of Alabama on a population basis would necessarily require that several senators be allotted to Jefferson County and that more than one each be allotted to Mobile County and to Montgomery County. We would add that, in order not

to submerge population as the controlling consideration in the apportionment of seats in the Senate, it might be found unavoidable to allot more than one senator to a multi-county district.

Thus, section 200 of the Alabama Constitution establishes two separate requirements for senatorial districts: (1) that there be one, and not more than one, senator per district, and (2) that no county shall be divided between two districts. The Supremacy Clause would require that one or the other of these requirements give way and be no longer controlling. On this question the parties are not in agreement.

█ Section 197 of the Constitution of Alabama provides that, "[t]he whole number of senators shall be not less than one-fourth or more than one-third of the whole number of representatives." The result has been that many senators have larger and more generalized constituencies than representatives from the same area. That constitutionally produced result would be reversed if a county were divided between two or more senatorial districts. Throughout the State's history, insofar as we are advised, representation in each House has been divided according to county lines, and no county has been subdivided to create a legislative district. Further, a resolution was unanimously adopted by the Legislature of Alabama on August 13, 1965, which reads as follows:

"*WHEREAS*, the Legislature at this time is endeavoring to reapportion the legislature of Alabama and the courts have stated a determination to reapportion the Legislature of the State of Alabama if the Legislature does not; and

"*WHEREAS*, under either legislative or court ordered reapportionment it is probable that in some instances a single county may be entitled to more than one member in each house of the legislature; and,

"*WHEREAS*, the operation of the ward system in many large cities and counties of the United States has amply demonstrated the viciousness and inherent dangers of sectionalism and 'bossism' in the ward system; therefore,

"*BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF ALABAMA that:*

"Under any system of legislative reapportionment adopted either by the Legislature or the courts, it is considered highly desirable that the area from which individual members of the legislature are to be elected should not be less than whole county units and that to provide otherwise would be to invite all the abuses and dangers inherent in ward systems of representation in highly populated areas."

We conclude that the Constitution of Alabama, construed as a whole and in the light of its application throughout the State's history, requires that representation in each House be divided according to county lines and that no county be subdivided to create a legislative district. Accordingly, it is the provision that there be one, and not more than one, senator per district which is required to give way and be no longer controlling.

Again, however, as has been discussed with reference to the concluding proviso of section 199 of the State Constitution, the provision that " * * * each [district] shall be entitled to one senator, and no more * * *," while no longer controlling, is not in our opinion totally inoperative. That provision must give way only when its application brings about an unavoidable conflict with the Constitution of the United States. In all except three or possibly four senatorial districts, the population figures are such that there need be no more than one senator per district.

█ There is no dispute about the size of either House. As clearly stated in the Supreme's Court's opinion, "Determining the size of its legislative bodies

is of course a matter within the discretion of each individual State." Reynolds v. Sims, 377 U.S. 533, at 581, 84 S.Ct. 1362, at 1392, n. 63 (1964).[8]

There is no dispute about the validity of that part of sections 199 and 200 of the Constitution of Alabama which requires reapportionment after each decennial census of the United States, and not more often. The Supreme Court held: "Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth." That means that such reapportionment as may result from this decision will remain in effect until the next apportioning session of the Legislature, after the next decennial census of the United States shall have been taken. If that session should fail in its primary responsibility to reapportion both Houses on a population basis, the State's citizens whose right to vote may have been impaired will have a judicial remedy under the Constitution of the United States. Thus, it will not be possible in the future for legislative malapportionment to continue for so long a period.

▇▇▇▇ An examination of the particular reapportionment bills enacted by the Legislature of Alabama causes us to emphasize the Supreme Court's directions which follow:

"So long as the divergencies from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. * * *

And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." (Emphasis added.)

Gerrymandering of either House of the Legislature for the purpose of preventing the election of Negroes to membership would furnish no rational ground for departure from reapportionment strictly according to population. Of equal importance is the principle, which we shall undertake to demonstrate, that gerrymandering for purposes of racial discrimination is by itself in violation of the Fourteenth and Fifteenth Amendments to the Constitution.

The practice of gerrymandering for the purpose of preventing members of a political party from being elected to office is a familiar one. That type of gerrymandering may continue to present a "political" question with which the judicial branch of government is not equipped to deal.[9]

▇▇▇▇ Whatever may be said of gerrymandering in general, gerrymandering of either House of the Legislature for the purpose of preventing the election of Negroes to membership takes a "contro-

---

8. See sections 50, 197 and 198 of the Alabama Constitution.

9. Cf. Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Wright v. Rockefeller, 211 F.Supp. 460, 464–465 (S.D.N.Y.1962). See also the dissenting opinion of Justice Frankfurter in Baker v. Carr, 369 U.S. 186, at 266–330, 82 S.Ct. 691, at 737–771, 7 L.Ed.2d 663 (1962). With Fortson v. Dorsey, 379 U.S. 433, at 439, 85 S.Ct. 498, at 501, 13 L.Ed.2d 401 (1965), and Holt v. Richardson, 240 F.Supp. 724, at 730 (D.Hawaii 1965) compare WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, at 925–927 (S.D.N.Y. 1965) aff'd 86 S.Ct. 24 (1965), especially concurring opinion and Justice Harlan, 86 S.Ct. 25, at 26.

versy out of the so-called 'political' arena and [places it] into the conventional sphere of constitutional litigation." Gomillion v. Lightfoot, 364 U.S. 339, 346–347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960). Any limitation of the persons for whom votes may be cast is logically a restriction on the right to vote. Political parties are not mentioned in the Constitution, but the abridgement of voting rights on account of race, color or previous condition of servitude is forbidden by the Fifteenth Amendment. The Supreme Court has long recognized that the Fifteenth and the more inclusive Fourteenth Amendments were adopted with the special intent of protecting Negroes and their voting rights.[10] No student of history could deny that premise.[11] We conclude that the Constitution itself requires a distinction between the familiar political abuse of gerrymandering and gerrymandering for the purpose of racial discrimination.[12]

To recapitulate *some* of the standards by which this court should be governed in ruling upon the constitutionality of the reapportionment acts passed by the Second Special Session of the Legislature of Alabama:

I. The dominant and controlling consideration is that both Houses be apportioned on a population basis.

II. Mathematical nicety is not required and reasonable deviations are permitted to insure some voice to political subdivisions or counties and to avoid a conflict with the State Constitution. Only when there is an unavoidable conflict does the Supremacy Clause control.

(a) The State Constitution construed in the light of its application throughout the State's history would require that representation in each House be divided according to county lines and that no county should be subdivided.

(b) So far as consistent with not submerging population as the controlling consideration, (1) no more than one senator should be allotted to a district, and (2) multi-representative, multi-county House districts should be avoided or minimized.

III. The apportionment in the two Houses should be compared and arranged so as to help balance off inequities and to assure that in the Legislature as a whole, so far as is practicable, one man's vote is worth as much as another's.

IV. Reapportionment of either House of the Legislature for the purpose of preventing the election of Negroes to membership or for any other racially discriminatory purpose cannot be approved.

Testing the constitutionality of the reapportionment Acts of the Legislature of Alabama by the foregoing standards, and after according to each all presumptions in favor of its constitutionality, we have concluded that the Act relating to the reapportionment of the Senate is constitutional, but that the Act to provide for the reapportionment of the House of Representatives is clearly unconstitutional.

The most serious criticism on the basis of population of the Act relating to the reapportionment of the Senate is in the district composed of Madison County, which has a 25.7% deviation

10. See Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873); Ex parte Commonwealth of Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880); Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); United States v. Reese, 92 U.S. 214, 23 L.Ed. 563 (1876).

11. See Swisher, American Constitutional Development, Houghton, Mifflin Co. (2nd ed 1954), pp. 329–348; Warren, Supreme Court in United States History, Little,

Brown & Co. (Rev. ed. 1926), Vol. II, pp. 600–618.

12. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); WMCA, Inc. v. Lomenzo, 238 F.Supp. 916 (S.D.N.Y.1965), aff'd 86 S.Ct. 24 (1965); but cf. Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965).

from the mean.[13] This does not meet the 15% standard suggested in Toombs v. Fortson, 241 F.Supp. 65, 70 (N.D.Ga. 1965). We do not, however, feel that the Legislature of Alabama was so strictly bound by that standard. The opinion in Toombs v. Fortson noted that the figure of 15% was drawn from a House of Representatives bill dealing with congressional redistricting, which is still pending in the United States Senate. The Supreme Court in Reynolds v. Sims, supra, reasoned that because there are larger numbers of seats in State legislative bodies than there are congressional seats "[s]omewhat more flexibility may therefore be constitutionally permissible with respect to State legislative apportionment than in congressional districting." Reynolds v. Sims, supra, 377 U.S. at 578, 84 S.Ct. at 1390. It follows that a larger deviation should be acceptable for State legislative reapportionment where such deviation is based upon legitimate and rational considerations.

■■■ The Legislature of Alabama may well have placed Madison County in a senatorial district by itself for several "legitimate considerations incident to the effectuation of a rational state policy." One such consideration is maintenance of the integrity of the political subdivisions of the State, the most important of which in Alabama are the various counties. Another proper consideration may have been its desire not to depart from the provision in section 200 of the Constitution of Alabama [14] except in the three instances (Jefferson, Mobile and Montgomery Counties) where the application of that requirement would clearly submerge population as the controlling consideration. We conclude that the devia-

tion from the mean in the Madison County district is not fatal to the Act.[15] This conclusion is buttressed by the principle that " * * * apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house." Reynolds v. Sims, supra, at 577, 84 S.Ct. at 1389. As later appears, we shall undertake to compensate Madison County's underrepresentation in the State Senate by some overrepresentation in the House of Representatives.

■ In other respects, the Act relating to the reapportionment of the Senate contains no constitutionally impermissible deviation on the basis of population. The ratio of the population of the most underrepresented district to the population of the most overrepresented district is 1:1.459. The minimum percentage of the State's population which would be represented by a majority of the senators is 47.8%.

The legislative reapportionment of the State Senate results in only three multi-senatorial districts—those comprising the counties of Jefferson, Mobile and Montgomery, respectively. Thus the legislative Senate plan complies with the State Constitution [16] so far as such compliance is possible in the light of the Supremacy Clause.

■ Strong inferences can be drawn from the reapportionment of some of the Senate districts of a legislative purpose to prevent the election of Negroes to membership in the State Senate. We have carefully considered each such instance and, in our opinion, in each case legitimate inferences are equally or more

---

13. Percentage deviation from the mean measures the degree to which the population of a given district departs from the population of a hypothetically perfect district. The mean is calculated by dividing the total state population by the number of representatives. For the Senate: 3,266,740 ÷ 35 equals 93,335. To calculate a district's percentage deviation, the difference between the district's popu-

lation per representative and the mean is found and then divided by the mean to determine the percentage.

14. That each senatorial district "shall be entitled to one senator, and no more."

15. It may be noted that the plan submitted by the United States as Amicus Curiae contained the same deviation.

16. Section 200, p. 102 supra.

justifiable. See Wright v. Rockefeller, supra, 376 U.S. at 55, 84 S.Ct. 603.[17]

For the foregoing reasons, we hold that Act No. 47, House Bill 22, passed in the Second Special Session of the Legislature in 1965 and approved by the Governor on September 24, 1965, is a valid and constitutional law. We will by formal order to be filed, together with this opinion, adopt the same as the order of this court.

We regret that we cannot reach the same conclusion as to the Act to reapportion the membership of the House of Representatives of Alabama. That Act contains 15 districts which deviate from the mean by more than 15%. We can find no rational basis or reason for that deviation. It contains 21 districts which deviate from the mean, without rational basis, in excess of 10%. The population of Mobile County is more than sufficient to allot to it 10 members instead of the 9 allotted. We find no rational basis for the failure to allot 10 seats in the House to Mobile County.

There is no justification for the Legislature's failure to compensate Madison County for its underrepresentation in the Senate by allotting to Madison County 5 members in the House of Representatives. To do so will result in Madison County's being overrepresented in the House of Representatives 23.8% as opposed to its being underrepresented in the State Senate 25.7%. The action this court proposes to take with respect to the House of Representatives, as hereinafter set out, includes this necessary and appropriate adjustment with reference to Madison County.

Furthermore, in reapportioning the House of Representatives, the Legislature has unnecessarily failed to regard the Constitution of Alabama in instances where the Supremacy Clause does not prevent application of the State Constitution. For instance, the legislative reapportionment of the House calls for three 3-county districts to which three representatives are allotted and one 4-county district to which three representatives are allotted.[18] No such extreme multi-representative, multi-county districts are necessary to achieve permissible population requirements under the Federal Constitution as is demonstrated by the reapportionment plan which we have formulated.

Our plan contains no 4-county district and no 3-county district with sufficient population to necessitate the allocation of 3 representatives. We have only grouped counties together where their population required it.

In contrast the legislative plan, for example, groups Macon, Elmore and Tallapoosa Counties into a single House district. This district is then allotted 3 representatives with the stipulation that one representative shall be a resident of each county but stand for election by a majority vote of the entire district. Each of these three counties varies but slightly from the hypothetically perfect or mean House district, 30,818.[19] Unnecessarily aggregating counties promotes the very lack of geographical compactness and gerrymandering that section 199 was intended to prevent.

If these multi-county, multi-representative districts cannot be explained on a

17. That was demonstrated to the members of this Court by the fact that the plan for reapportionment of the Senate, which they tentatively but carefully formulated with no racial considerations in mind, but largely to obviate the extreme population deviation of Madison County (our tentative plan combined Madison and Morgan Counties to make a two-senator district), produced results from which it would have been possible to infer a motive of racial discrimination, which we knew did not exist.

18. Shelby Chilton and Autauga are proposed as one House district with three representatives; Russell, Barbour and Henry are proposed as a House district with three representatives; Elmore, Tallapoosa and Macon are proposed as a House district with three representatives, and Bullock, Pike, Coffee and Geneva are proposed as one district with three representatives.

19. The population of the three counties is: Macon, 26,717; Elmore, 30,524; Tallapoosa, 35,007.

geometric, geographic or equalization basis, and we find they cannot, why did the Legislature adopt them?

■ We think but one answer is consistent with all of the facts and circumstances. Judicial notice is taken of a number of very important facts, including the last census report showing the racial composition of these aggregated counties.

On August 7, 1965, the Attorney General of the United States, pursuant to the Voting Rights Act of 1965,[20] designated Alabama as a state which maintained one or more tests or devices, as defined in section 4(c).[21] Three days later, the Attorney General certified in accordance with section 6 of the Voting Rights Act of 1965 that the appointment of federal examiners for Lowndes and Marengo Counties "is necessary to enforce the guarantees of the Fifteenth Amendment." [22] The Attorney General took similar action as to Perry and Wilcox Counties on August 20, 1965.[23]

Ten counties in the State of Alabama are presently under injunction against further discrimination with regard to Negro voter applicants;[24] proceedings are now pending as to an eleventh county.[25] The long history of the Negroes'

20. P.L. 80–110.

21. 30 Federal Register 9897.

22. 30 Federal Register 9970–9971.

23. 30 Federal Register 10863.

24. Macon County: United States v. Alabama (M.D.Ala.), 188 F.Supp. 757 (1960), and 192 F.Supp. 677 (1961); 5 Cir., 304 F.2d 583 (19 ), 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). Other orders: 171 F.Supp. 720 (1959); 5 Cir., 267 F.2d 808 (1959); 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960); Supplemental opinion, Sept. 13, 1961; Order of April 27, 1965.

Williams v. Wallace (M.D.Ala.), 240 F. Supp. 100 (1965); in appendix A to this opinion the voter registration statistics for Dallas, Perry, Wilcox, Hale, Choctaw and Marengo Counties are listed. On page 103, n. 2, it is noted that no Negroes were registered to vote in Lowndes County.

Bullock County: United States v. Alabama (M.D.Ala.), 7 RRLR 1146 (1961). Other orders: Nov. 16, 1961; Jan. 17, 1962; Mar. 27, 1962; July 26, 1962; April 27, 1965.

Montgomery County: United States v. Penton (M.D.Ala.), 212 F.Supp. 193 (1962); Supplemental order December 17, 1964.

Elmore County: United States v. Cartwright (M.D.Ala.), 230 F.Supp. 873 (1964); Supplemental order April 27, 1965.

Hale County: United States v. Tutwiler (S.D.Ala.), filed Dec. 16, 1963, Civil Action No. 3200–63. Hearing held July 29, 1965.

Sumter County: United States v. Hines (N.D.Ala.). Civil Action No. 63–609; Order of September 17, 1964; 9 RRLR 1332; Supplemental Proceedings, Nov. 1964.

Perry County: United States v. Scarborough (formerly United States v. Mayton and United States v. Blackburn) (S.D.Ala.), Civil Action No. 2881, Order of Nov. 15, 1962, 7 RRLR 1136; Supplemental Orders: Jan. 16, 1963; May 17, 1963; April 5, 1963 (5 Cir. Nos. 20346 and 20344), appeal dismissed May 8, 1963; 325 F.2d 433; Supplemental orders: Aug. 15, 1963; Sept. 23, 1963; Sept. 27, 1963; July 23, 1964 (5 Cir. No. 21032), 335 F. 2d 153; Oct. 16, 1964; Nov. 2, 1964; Nov. 18, 1964; Feb. 24, 1965; March 16, 1965 (order granting supplemental relief); May 27, 1965; May 28, 1965; June 30, 1965 (5 Cir. No. 21860 and No. 22305); July 19, 1965.

Choctaw County: United States v. Ford (formerly United States v. Doggett) (S. D.Ala.), Civil Action No. 2829; Decided April 13, 1964; 9 RRLR 1330; Supplemental order, June 18, 1965.

Dallas County: United States v. Atkins (S.D.Ala.) Civil Action No. 2584, 210 F. Supp. 441 (1962); 323 F.2d 733 (5 Cir. 1963). Supplemental orders: Feb. 4, 1965; Feb. 17, 1965; March 5, 1965; March 26, 1965; April 9, 1965; May 27, 1965; June 1, 1965; June 18, 1965; July 20, 1965.

Wilcox County: United States v. Logan (S.D.Ala.), March 31, 1964, Civil Action No. 3081–63, 344 F.2d 290 (5 Cir. 1965). Order on motion for preliminary injunction, June 9, 1965.

25. Marengo County: United States v. Elsberry (S.D.Ala.), filed July 1, 1965. Trial set for September 27, 1965. Civil Action No. 3791–65.

struggle to obtain the right to vote in Alabama has been trumpeted before the Federal Courts of this State in great detail. To cite every case would serve only to overburden an already too lengthy opinion.

The House plan adopted by the all-white Alabama Legislature was not conceived in a vacuum. If this court ignores the long history of racial discrimination in Alabama, it will prove that justice is both blind and deaf.

The conclusion is inescapable that Elmore, Tallapoosa and Macon were combined needlessly into a single House district for the sole purpose of preventing the election of a Negro House member.[26] In the Bullock-Pike-Coffee-Geneva House district to which the Legislature proposes to allot three members, the inference is also clear that there is no purpose other than racial considerations. The obvious effect of this grouping, from a racial standpoint, is to equalize the 71.9% of nonwhite citizens in Bullock County.

 Systematic and intentional dilution of Negro voting power by racial gerrymandering is just as discriminatory as complete disfranchisement or total segregation. The principles rationally extrapolated from the voting rights cases derive content from the concrete situations that gave rise to them. What the Constitution forbids is "discrimination," " 'sophisticated as well as simple-minded * * *.' Lane v. Wilson, 307 U.S. 268, 275 [59 S.Ct. 872, 83 L.Ed. 1281]" [27]

 With the pattern and practice of discrimination in Alabama as a backdrop, the cavalier treatment accorded predominantly Negro counties in the House plan takes on added meaning. The court is permitted to find the intent of the Legislature from the consistency of inherent probabilities inferred from the record as a whole. We, therefore, hold that the Legislature intentionally aggregated predominantly Negro counties with predominantly white counties

for the sole purpose of preventing the election of Negroes to House membership. The plan adopted by the Legislature can have no other effect.

The background and facts here presented are substantially different from those appearing in the record in Wright v. Rockefeller, 211 F.Supp. 460 (S.D.N.Y. 1962), aff'd 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). There nonwhites had long been given the vote and had historically been represented by nonwhites in the councils of state. Historic maps were introduced to show that the districts had always had erratic lines aggregating neighborhoods. Based on this background, Judge Moore declined to infer, from statistics showing racial concentrations, that the legislature purposely drew districts that insured nonwhites would be elected to office.

In the present case, we have a situation where nonwhites have been long denied the right to vote and historically have not been represented by nonwhites in the councils of state. Historically, counties have been the voting unit, but suddenly we find without any apparent reason a number of counties that are entitled to their own representatives on a population basis aggregated, turning Negro majorities into minorities. It would be unfortunate if Alabama's Negroes were to find, just as they were about to achieve the right to vote, that that right had been abridged by racial gerrymandering.

In the Wright case, in the district court all three judges agreed that if the legislature intentionally discriminated against Negroes, the plan would be unconstitutional. The only disagreement as to law in the district court or in the Supreme Court was whether effect alone was enough. As we have indicated above, we find the House plan has the inescapable effect of discriminating against Negroes. We further find that this discrimination was what the Legislature intended. In the instant case there is not even evi-

26. See discussion, supra at pp. 107, 108.

27. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

dence that would support a "contrary inference." [28]

In Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), the Supreme Court recognizes that multi-county, multi-representative districts, under the circumstances of a particular case, "would operate to minimize or cancel out the voting strength of racial or political elements * * *." [29] The question was not raised on the record in that case. The court, therefore, held that "under these circumstances, this issue has 'not been formulated to bring it into focus, and the evidence has not been offered or appraised to decide it, our holding has no bearing on that wholly separate question.' Wright v. Rockefeller, 376 U.S. 52, 58 [84 S.Ct. 603]." The Fortson case does not support the contention that multi-county, multi-representative districts are permissible regardless of their effect or the motive underlying their creation.

In our opinion the present case falls squarely within the rationale of Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). The House plan clearly contravenes the Fourteenth and Fifteenth Amendments to the United States Constitution and must, therefore, be declared invalid.

We find the plaintiffs as citizens of the United States and the State of Alabama are denied the equal protection of the law accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their vote in the House of Representatives of the State of Alabama. The Legislature of the State of Alabama has failed and continues to fail to reapportion the House of Representatives as required by law.

We, therefore, hold that Act No. 48, House Bill 61, passed in the Second Special Session of the Legislature in 1965 and approved by the Governor on September 24, 1965, is invalid and unconstitutional, because it contravenes the Fourteenth and Fifteenth Amendments of the Constitution of the United States.

---

**28.** Cf. Wright v. Rockefeller, 376 U.S. 52, at 57, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

**29.** 379 U.S. at 439, 85 S.Ct. at 501.