James H. M. HENDERSON, Anthony T. Reid, Otis Pinkard, Lonnie Hooks, Oscar L. Downs, R. V. Harris, on their own behalf and on behalf of all others similarly situated, and the Alabama Council on Human Relations, Inc., Plaintiffs,

v.

ASCS, MACON COUNTY, ALABAMA, et al., Defendants.

Civ. A. No. 771–E.

United States District Court,
M. D. Alabama, E. D.
Aug. 31, 1970.
Decree Sept. 18, 1970.

Solomon S. Seay, and Fred D. Gray, Gray, Seay & Langford, Montgomery, Ala., for plaintiffs.

Ira DeMent, U. S. Atty., and F. E. Leonard, Jr., Asst. U. S. Atty., Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

JOHNSON, Chief Judge.

This is a class action challenging the validity of the Agricultural Stabilization and Conservation Service (hereinafter ASCS) community and county committee elections for the years 1967 and 1969 in Macon County, Alabama.[1] Plaintiffs, who represent Negro farm owners, tenants and sharecroppers eligible to participate in ASCS elections in Macon County, allege that defendants have discriminated against them in violation of their rights under the Fifth and Fifteenth Amendments to the United States Constitution "by manipulating the election procedures in such a way as to control the outcome and assure the election" of white ASCS community and county committeemen. They seek preliminary and permanent injunctions ordering defendants to set aside the 1967 and 1969 community and county elections and to hold new elections under the supervision of this Court. Defendants

1. In their substituted complaint filed on July 31, 1968, plaintiffs challenged the validity of the 1967 ASCS elections and the constitutionality of certain provisions in the official ASCS Handbook. On September 24, 1968, this Court granted defendants' motion to dismiss (without prejudice to the action being brought in an appropriate forum) because the Secretary of Agriculture, without whom an adequate judgment could not be rendered, within the meaning of Federal Rules of Civil Procedure 19(b), could not properly be served in this district.

On October 23, 1968, plaintiffs appealed the dismissal to the Fifth Circuit. The parties to this case, on August 4, 1969 filed with the Fifth Circuit a joint motion to remand; such motion was granted on August 12. In the motion, plaintiffs agreed to withdraw their attack on the constitutionality of the Handbook provisions, thereby obviating the need to join the Secretary of Agriculture as a party defendant. On October 8, 1969, plaintiffs were permitted by this Court to amend their complaint in order that they might challenge the validity of the 1969 ASCS elections.

are the State Director of the Alabama ASCS and the individual members, office manager, and staff of the ASCS Macon County Committee. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1361. As provided by Rule 52, Federal Rules of Civil Procedure, this Court will incorporate the appropriate findings of fact and conclusions of law in this memorandum opinion.

## BACKGROUND

ASCS, which was established by Congress to administer federal crop acreage allotment, commodity price support and certain agricultural conservation programs, operates through state, county and community committees. The state committees, whose members are appointed by the Secretary of Agriculture, supervise the county and community committees. The primary responsibility for determining which farmers receive conservation grants, additional allotments of released acreage and price support loans and payments rests, however, with the county committee, the key administrative organ in the ASCS.

The county committees are also responsible for conducting community committee elections in accordance with regulations promulgated by the Secretary of Agriculture and instructions issued by the ASCS.[2] Each community committee is comprised of three regular and two alternate members who are elected annually by the eligible voters in the community. Candidates for the position of community committeeman are nominated in one of two ways. First, any person satisfying the ASCS eligibility requirements may become a candidate by filing with the county committee a petition containing the signatures of a specified number of eligible voters. Second, the community and county committees serving at the time are required to select at least six, but not more than ten, candidates in addition to those nominated by petition. Thus, if four candidates are nominated by petition, and the community committee selects only three candidates, the county committee must nominate at least three and may nominate up to seven candidates.

The state committee is authorized to designate the appropriate election method to be used.[3] In Alabama, election is by secret ballot and plurality vote, with each eligible voter having the option to vote for up to five candidates. All ballots must be mailed by the county committee office no later than ten days before the day of the election. A marked ballot, in order to be valid, must be returned in a plain white envelope which, in turn, must be enclosed in an outer envelope bearing the voter's signature or witness mark. All ballots must remain in sealed boxes until the prescribed date for counting and must be retained after counting in sealed boxes for a period of thirty days.

The primary function of the community committees is to elect the county committee. Those candidates who are elected regular community committeemen serve as delegates to the annual county convention. There the delegates elect committeemen to fill vacancies on the three-man county committee.[4] In addition, the delegates elect one member of the county committee as chairman and one member as vice chairman.

Any eligible voter in the county may appeal the validity of the community committee elections to the county committee. If the party is dissatisfied with the county committee's decision, he may appeal to the state committee.[5]

---

2. 7 C.F.R. § 7.9.

3. 7 C.F.R. § 7.11.

4. 32 C.F.R. § 7.12. Since county committeemen serve staggered three-year terms, there is usually only one vacancy to be filled each year on the county committee.

5. The record shows that plaintiffs utilized these appeal procedures after both the 1967 and 1969 elections. In both instances, the validity of the elections was upheld by the Alabama state committee.

## THE 1967 ELECTION

Macon County, Alabama, is divided into five ASCS communities, each of which has its own three-man committee. In the 1967 community committee elections, community *1* had 12 candidates running for committeeman positions. Each of the four candidates nominated by petition was black. The community committee then in office selected eight candidates, seven of whom were Negro,[6] while the county committee made two nominations, both of whom were white. While the Negro candidates received a total of 563 votes, or 59.1 percent of the total votes counted, the votes were split in such a way that none of the nine black candidates was elected to the three-member community committee.

Almost identical situations arose in communities *2* and *4*. In community *2*, of the twelve candidates seeking positions on the community committee, nine were Negro and three were white. Four of the Negro candidates were nominated by petition, one was selected by the incumbent community committee, and six were nominated by the county committee.[7] Even though the nine Negro candidates received 63.6 percent of the votes counted, only one Negro was elected as a regular committee member.

There were thirteen candidates in community *4* running for the three committeeman positions. All five candidates nominated by petition were Negro. The community committee selected one white candidate. The county committee nominated eight candidates, six of whom were Negro.[8] Negro candidates received 59.5% of the total votes counted, yet, because the votes were so evenly spread among them, none of them was elected to serve on the committee.

In community *3*, blacks were elected to all three positions on the community committee. Here again, however, there were approximately three times as many Negro candidates as there were white. Each of the three candidates nominated by petition was Negro. The community committee nominated five candidates, four of whom were Negro.[9] Three black and two white nominees were selected by the county committee. The nine black candidates received 67.3% of the vote counted.

Community *5*, the only predominately white community, had ten candidates running for committeeman positions. No candidates were nominated by petition. Of the six candidates nominated by the community committee, five were Negro. The county committee nominated one black and three white candidates. None of the Negro candidates, who received 31.9% of the votes counted, was elected to the committee.

Thus, the record shows that all 16 candidates nominated by petition, 14 of the 19 candidates selected by the various community committees, and 13 of the 24 candidates nominated by the county committee, or 43 out of a total of 59 candidates, were Negro. Communities *1, 2, 3* and *4* each had only three white candidates; community *5* had four. While Negro candidates received 57.8% of the total votes tabulated, eleven of the fifteen community committeemen elected were white.[10]

Plaintiffs allege that the county and community committees nominated such a high percentage of Negro candidates in order to split the black vote of predominately Negro Macon County. They point to the fact that there were

6. One of the black candidates selected by the community committee was also nominated by petition and another was declared ineligible before the election.

7. Two of the six Negro candidates nominated by the county committee were also nominated by petition.

8. One of the six Negro candidates nominated by the county committee was declared ineligible before the election.

9. One of the Negro candidates nominated by the community committee was also nominated by petition.

10. The nominations, racial identity of the candidates, the number and race of those elected, the votes cast and the significant percentages are all graphically illustrated on the appendix attached to this opinion.

approximately three times as many black candidates as there were white. One member of the county committee, Cunningham, testified that he attempted, in selecting candidates, to achieve a black/white ratio comparable to the ratio of black eligible voters to white eligible voters in Macon County. The Court can find no ASCS regulation in existence in 1967 which either required or recommended that the racial composition of community committee candidates be identical to that of the eligible ASCS voters in the county. To the contrary, the Court finds that the 1967 election procedure merely required that where minority group members comprised at least 10 percent of the eligible voters in a community, a minority group member was to be placed on the ballot unless one or more was nominated by petition.

The other two defendant county committeemen, Weldon and Segrest, denied at trial that any of their selections were racially motivated. They contend that all candidates were nominated in accordance with section 40 of the ASCS Handbook which instructs county committeemen to select nominees who are well qualified for committee work and who represent various sections and types of agriculture in the community. Neither of them explained, however, why they nominated many blacks about whom they knew virtually nothing, while passing over many whites whom they knew to be qualified and with whom they were more familiar than the Negroes they did in fact nominate.

■■■ Conduct on the part of government officials which results in disparate treatment toward members of a particular race must be subjected to the "most rigid scrutiny." [11] Having carefully reviewed the evidence, this Court finds that defendants have failed to demonstrate any compelling interest or legitimate overriding purpose [12] independent of invidious racial discrimination to justify the nomination of such a disproportionate number of black candidates. The evidence clearly reflects that defendants' purpose in nominating a plethora of Negro candidates was to prevent the election of Negroes to membership on the community and county committees. The effect of defendants' discriminatory conduct was to deny Negro candidates the opportunity to compete for office on an equal basis with white candidates.

■■ The nomination by defendants of an inordinate number of Negro candidates also resulted in the dilution of the voting strength of the Negro majority in Macon County. While "[t]he principles rationally extrapolated from the voting rights cases derive content from the concrete situation that gave rise to them," Sims v. Baggett, 247 F.Supp. 96, 109 (M.D.Ala.1965), one principle of universal application is that a qualified voter has a constitutional right to vote in elections without having his vote wrongfully denied, debased, or diluted. The importance of an unrestricted and meaningful exercise of the franchise has been emphasized by the Supreme Court on numerous occasions.[13] In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, the Supreme Court stressed that:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the

11. Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); see Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

12. Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967);

McLaughlin v. Florida, 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

13. See e. g., Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

weight of a citizen's vote just as effectively as by wholly, prohibiting the free exercise of the franchise.[14]

This Court is not required, however, to decide whether the "one-man, one-vote" rule enunciated by the Supreme Court in *Reynolds* applies to the facts of this case,[15] for here the voting power of an entire class, more particularly, the eligible Negro voters in Macon County, has been diluted by the action of government officials. As has been previously noted, defendants have failed to produce any acceptable evidence to justify the conduct—the nomination of such a disproportionate number of black candidates—which gave rise to that dilution. Thus, "[w]hile [recognizing that] the Fifth Amendment contains no equal protection clause," [16] this Court concludes that defendants' conduct was "so unjustifiable as to be violative of due process." [17]

The evidence reflected other irregularities in the voter registration procedures that require a finding that the 1967 elections were conducted in a racially discriminatory manner.

In 1967 the ASCS Handbook provided, for the first time, that each owner of record of jointly owned farm property was entitled to vote in ASCS elections if he satisfied the other ASCS eligibility requirements.[18] Of the sixty-two purported owners of record who voted in the 1967 community elections as a result of this new provision, all but seven were white. Such a disproportionate turnout, by itself, strongly suggests that the registration procedures were discriminatorily applied. The evidence clearly shows, moreover, that while the few Negroes who received notice of the provision were required to verify in writing that they were owners of record *and* to produce the actual deeds of conveyance in order to register, whites were only required to sign the certification forms. This is borne out by the fact that fourteen of the fifty-five white voters who registered under this provision were later declared ineligible (and their names were stricken from the 1968 ASCS voting lists) when it was determined that they were not, in fact, owners of record of jointly owned farm property.

14. 377 U.S. at 555, 84 S.Ct. at 1378. The fact that *Reynolds* dealt with a less subtle mode of discrimination, malapportionment, is not significant, for what the Constitution forbids is "discrimination," "sophisticated as well as simple-minded * * *". Sims v. Baggett, *supra*, 247 F.Supp., at 99; quoting Gomillion v. Lightfoot, 364 U.S. 339, 342, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

15. In Hadley v. Junior College District of Metropolitan·Kansas City, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), the Supreme Court, noting that "[i]n some instances the election of a local sheriff may be far more important than the election of a United States Senator," 397 U.S. at 55, 90 S.Ct. at 795, held as a general rule "that the guarantee of equal voting strength for each voter applies in all elections of governmental officials * * *." 397 U.S. at 58, 90 S.Ct. at 796. The Court limited its holding, however, by noting that "there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds, supra*, might not be required, * * *." 397 U.S. at 56, 90 S.Ct. at 795.

16. Shapiro v. Thompson, 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969).

17. Shapiro v. Thompson, *supra*; see Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Having found an infringement of plaintiffs' rights under the Fifth Amendment, this Court finds it neither necessary nor appropriate to adjudicate whether defendants' discriminatory conduct also violated plaintiffs' rights under the Fifteenth Amendment. Cf. Nixon v. Herndon, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927).

18. Prior to 1967, only one of the owners of record of a jointly owned farm was eligible to vote in ASCS elections.

 Further, the plaintiffs, in an attempt to bolster their claim of purposeful racial discrimination, allege that: (1) the county office maintained, immediately prior to the elections, a list which identified eligible ASCS voters by race and that defendants used this list to solicit votes from whites, and (2) an extremely high percentage of the rejected ballots were cast by Negro voters. While the record clearly establishes that such a list did, in fact, exist and that a significant number of the rejected ballots were cast by blacks, this Court finds that the evidence submitted by plaintiffs failed to show that the list was ever used in an improper manner or that any of the votes cast by Negro voters were wrongfully rejected.

## THE 1969 ELECTION

 The county office sent approximately two thousand ballots to ASCS voters in the 1969 community elections. A number of these ballots could not be delivered by the United States Post Office and were returned to the county office. All but eighty of these undelivered ballots were, however, eventually picked up by the respective voters.

The main thrust of plaintiffs' attack on the validity of the 1969 elections is that a large number (approximately seventy) of these undelivered and unclaimed ballots were addressed to Negro voters. At trial, plaintiffs adduced evidence showing that approximately twenty-five Negro voters who had received their ballots and voted in the 1967 elections did not receive their ballots for the 1969 elections even though none of them had changed his address and that all but five of the unclaimed ballots were addressed to voters living in communities *1, 3* and *4,* the predominantly Negro communities.[19]

This Court finds, however, that the evidence submitted by defendants rebuts any inference of racial discrimination. Defendants' evidence shows that the United States Post Office, rather than the ASCS county office, was responsible for the nondelivery of the eighty ballots.

The Tuskegee Post Office in Macon County has two postal routes, No. 1 and No. 2. Almost all the undelivered ballots were addressed to voters living on postal route No. 2, which included communities *1, 3* and *4.* Although all the postal box numbers for route No. 2 were changed in 1964, many residents still used, and much of the mail was still addressed to, the pre-1964 box numbers. The Postmaster of the Tuskegee Office testified that, because many residents still use their old box numbers, only an experienced mail carrier, one who knows all the families on the route, would be able to deliver every parcel of mail to each family. The evidence further reflected that a new mail carrier was assigned to route No. 2 on the very day the ballots were to be delivered. Thus, this Court does not find it at all surprising that certain ASCS voters, who had received earlier ASCS mail without difficulty, did not receive their 1969 ballots.

In holding that plaintiffs have failed to sustain their burden of proving that the 1969 community elections were conducted in a discriminatory manner, this Court finds the other allegations raised by plaintiffs as to the 1969 elections to be totally without merit.

The parties will jointly prepare and present to this Court within 10 days from the date of this memorandum opinion a proposed decree.

---

19. The record shows that thirty-eight of the undelivered and unclaimed ballots were from community 1, one from community 2, nineteen from community 3, eighteen from community 4, and four from community 5.

**438**

### DECREE

Pursuant to the findings of fact and conclusions of law entered in the Memorandum Opinion of this Court on August 31, 1970, it is the order, judgment and decree of this Court:

I. That the defendants, ASCS of Macon County, Alabama; Louis G. Rambo, as State Director of the Alabama Agricultural Stabilization and Conservation Services (ASCS) of the Department of Agriculture; Clyde P. Mahaffey, as Chairman of the Alabama ASCS Committee; Jim Weldon, as ASCS Macon County Committee Chairman; B. M. Segrest, as ASCS Macon County Committee Vice-Chairman; Otis Pinkard, as ASCS Macon County Committee Member; Earl P. Brannon, as Office Manager of the ASCS Macon County Committee, and Marjorie Hornsby, Josephine Cole, Ann Simpson, Elizabeth Newman and Bruce Bufford as staff members of the ASCS Macon County Office; their agents, officers, successors in office, employees and all persons acting in concert or participation with them, be and they are hereby permanently enjoined from engaging or participating in, or in any way encouraging, racially discriminatory practices and policies in the administration of ASCS community and county elections, including, but not limited to, the selection and nomination of candidates and the distribution and counting of ballots.

II. It is further ordered that B. M. Segrest be and he is hereby permanently enjoined from exercising any of the rights or assuming any of the responsibilities associated with the committeeman position to which he was elected in the 1967 Macon County ASCS County Committee elections; that the committeeman position now held by B. M. Segrest be and is hereby declared vacant; and that the vacancy created hereby be filled at a new election to be held in accordance with appropriate ASCS rules and regulations.

III. It is further ordered that the court costs incurred in this cause be and they are hereby taxed against the defendants.